# Richmond

## ANNA KATE FOSTER v. JENNIE HELMS.

January 13, 1938.

Present, All the Justices.

The opinion states the case.

*Minter & Minter,* for the appellant.

*Martin & Abbott* and *Charles Curry,* for the appellee.

HUDGINS, J., delivered the opinion of the court.

This suit was instituted in the Circuit Court of Craig county to set aside an alleged deed executed by Amanda Fisher purporting to convey to Anna Kate Foster all real estate and personal property owned by the grantor, in consideration of support and maintenance to be given Amanda Fisher for life. The grounds of the attack are: (1) That Amanda Fisher was mentally incapable of executing the instrument; (2) that it was obtained by fraud and undue influence; (3) that there was failure of consideration; (4) that the consideration given was inadequate; and (5) that the instrument is testamentary in character and lacking the legal requirements for a deed.

The answer denies each and every allegation of fact. Depositions were taken, but when the case was fully matured for hearing, the judge of the Circuit Court of Craig county, being of opinion that it was improper for him to sit in the case, transferred the papers in the cause to the Circuit Court of the city of Lynchburg, which held the deed invalid on the first ground.

■ Under these circumstances, while the decree of the trial court is regarded as *prima facie* correct, it is not entitled to the same weight as a verdict of a jury or the judgment of a trial judge before whom the testimony of witnesses is taken *ore tenus*.

The following facts were established by uncontradicted testimony. Amanda Fisher was an illiterate widow, without children, seventy-eight years of age, who had lived practically all her life in the town of New Castle, Craig county. She made a living by washing, cleaning, and doing other small jobs, but she was very frugal and at the time of her death owned a small house, two lots, and had some $3,400 in a savings account in the First National Bank of New Castle. Her nearest relative was a sister, Mrs. Virginia Helms, who lived with her husband and family on Barbour's Creek some fifteen miles from New Castle. Sometime after Amanda Fisher's husband died, she lived for a short time with her sister, but she became dissatisfied and returned to her home in New Castle, stating that she never expected to trouble "them," meaning Mrs. Helms and her family, again. Thereafter, she lived alone performing her humble tasks. No one except the bank officials knew that she had a substantial sum on deposit until about a month and a half before her death. On the 12th of December, 1933, she executed a will making Mrs. Helms her sole beneficiary.

Anna Kate Foster was a much younger married woman, who for more than ten years had lived in sight of Amanda Fisher, with whom she was on very intimate terms. She frequently took or sent Amanda Fisher delicacies from her own table, and otherwise sought to comfort and cheer her lonely neighbor with no thought of compensation. Mrs. Fisher expressed her appreciation of the kindly acts done for her by Mrs. Foster, and a desire to do something for her.

While Mrs. Fisher was reticent about her financial affairs, Mrs. Helms and other members of her family knew that Mrs. Fisher had approximately $300 in currency hid-

den in her home. On the 14th of October, 1934, Mrs. Fisher, at the invitation of her sister, spent the day at Mrs. Helms', on Barbours Creek. Between 9:00 A. M. and 3:00 P. M. of that day, Mrs. Fisher's home in New Castle was entered. Her money and other tangible personal property were stolen. Sometime after that date Ira Helms, a son of Mrs. Virginia Helms, was seen to have a $20 gold piece with a cross cut across the center. Mrs. Fisher had treasured a similar coin with a similar cross mark for many years as a gift from her husband. When Mr. Helms was cross-examined about the possession of this gold piece, he at first refused to answer the questions, and when pressed, was evasive in his replies as to how he had obtained it and of the disposition he had made of it. Whether justly or unjustly, it seems that Mrs. Fisher was of the opinion that there was some connection between her invitation to visit her sister on that particular day, and the disappearance of her money from her home. At any rate on November 16, 1934, she executed the deed in question, purporting to convey all of her real and personal property to Mrs. Foster.

It is established by uncontradicted testimony that Mrs. Fisher requested T. L. Foster, the husband of Anna Kate Foster, to ask Hugh T. Estes, the Commonwealth's attorney of Craig county, and O. O. Lugar, the treasurer of Craig county, to come to her home as she had some legal business she wanted them to do for her. Mr. Lugar testified that he had lived in the town of New Castle for twenty-six years; that he had known Mrs. Fisher during all of that time, and that Mrs. Foster was his niece. He thought, when he went there, that perhaps Mrs. Fisher desired to execute a will, and that he was being called as a witness. He was in Mrs. Fisher's home an hour and a half before Mr. Estes came. During this interval Mrs. Fisher talked to him about news of the community and seemed normal in every way. Nothing was said about legal matters until Mr. Estes came. He was the fifth person in the room. The others were Mrs. Fisher, Mr. and Mrs. Foster, and Mr. Lugar. Mr. Estes after a few minutes of casual con-

versation remarked to Mrs. Fisher that he understood that she wanted him to prepare some papers for her. She said that she wanted to give her property to Mrs. Foster in consideration of Mrs. Foster looking after her and taking care of her as long as she lived. Mr. Estes then explained to her the difference between a will and a deed. She told Mr. Estes that she wanted Mrs. Foster bound to take care of her, and that in return for that, she wanted to convey all her property to her. Mr. Estes explained that if she made a will, she had the right to change that will whenever she so desired. She told him she wanted the papers fixed right.

Mr. Lugar's account of this interview is corroborated in every particular by the other witnesses present. In addition, Mr. Estes stated that he said to Mrs. Fisher: "If you make a deed, you will tie yourself so you can never undo it," I said: "I want you to understand that now," and she said: "That is what I want, I want to fix it up that way, and I want to tie Mrs. Foster. I want her to take care of me.

\*　　\*　　\*　　\*　　\*　　\*　　\*

"Now I want you to do this right, because I don't want to make any more wills or deeds, what I do tonight, I want to be the last paper I ever make pertaining to my property."

Mr. Estes explained to Mrs. Fisher the difference between tangible and intangible personal property. Mrs. Fisher stated that she had some money, and that she wanted the money included in the contract. She did not state the amount of money she had or where she kept it. Mrs. Foster said that she knew that Mrs. Fisher had some money, probably enough to pay her burial expenses, but that she had no idea that Mrs. Fisher had as much as $3,000 in the bank.

The testimony of these four witnesses is positive and emphatic to the effect that Mrs. Fisher appeared normal and knew exactly what she wanted done with her property,

and directed the lawyer selected by her to prepare the legal papers so as to make her wishes effective.

Mr. Estes obtained a description of the real estate owned by Mrs. Fisher, prepared the deed in controversy according to her instructions, and sent it to her by Mr. Foster. Mr. John Caldwell, the trial justice of Craig county, testified that both Mr. and Mrs. Foster were present when he took Mrs. Fisher's acknowledgment to ·the deed. Mrs. Fisher told him that the deed had been read to her, but as was his custom in taking the acknowledgment of old people, he read the entire instrument to her. She seemed, as far as he could tell, entirely satisfied with the disposition made of her property. As she could not write her name, he wrote it, at her request. On the issue of mental incapacity, the trial justice testified that he had known Mrs. Fisher for more than forty years, that during twenty years of that time, she washed for him, and he saw her twice a week. During the last four or five years of her life he had not seen her as frequently, but he had seen and talked to her a number of times. Her mind was clear and normal when she executed the deed.

No direct evidence was introduced to contradict or discredit the positive and affirmative evidence of the three officers of Craig county.

Senator Layman happened to be in the clerk's office and read the deed soon after it was recorded. He advised the bank not to honor checks drawn by Amanda Fisher. As a matter of fact, Amanda Fisher had drawn no checks on the account from the time she made the first deposit in 1920. She had simply continued to make deposits and had allowed the interest to accumulate.

Sometime in December, 1934, Mrs. Helms ascertained that the deed in question had been executed and recorded, and that her sister had a large sum on deposit. Mrs. Helms made several visits to her sister, and on one of these visits angry voices were heard in Mrs. Fisher's .home. Thereafter, Mrs. Foster was not a welcome visitor to Mrs. Fisher. On several occasions she was denied admission to the

house. On December 17, 1934, Mrs. Fisher, over protest of Mrs. Foster, was removed to Mrs. Helms' home. Mrs. Fisher attempted to draw all of the $3,400 from the bank. The bank refused to permit her to do so. Thereafter this suit was instituted in the name of Amanda Fisher.

On the 12th of January, 1935, the deposition of Mrs. Fisher was attempted to be taken at her bedside in Mrs. Helms' home. She had been ill for several weeks prior to this date, and was too weak physically and mentally to testify. It is conceded that on that day she was mentally unbalanced and remained so until her death on February 3, 1935. The will of December 12, 1933, was admitted to probate. Mrs. Helms qualified as executrix and this suit was revived in her name.

Dr. Abbott is the only witness who testified that Mrs. Fisher was mentally incapable of executing the deed. He stated that he made one professional call on Mrs. Fisher in November, 1933, when she was suffering from an injured arm. At that time he claimed to have made a thorough examination of her mental condition, and reached the conclusion that she was mentally incompetent and remained so until her death fifteen months later. If this testimony is true, then Mrs. Fisher was incapable of executing the will bearing the date December 12, 1933. No one claims that.

The testimony of Dr. Abbott is in direct conflict with every other witness, including appellee, who testified as to Mrs. Fisher's mental condition. Dr. Mitchell stated that in 1933, he treated Mrs. Fisher four or five times for the injury to her arm, and that her mind was in as good a condition as he ever saw it, and that she was fully capable and mentally responsible. He never talked to her again until he was called to visit her in January, 1935, at which time she was extremely ill, and was mentally unbalanced.

Mrs. Helms testified to various statements made to her by Mrs. Fisher, after November 16, 1934, regarding her transactions with Mrs. Foster, and how Mrs. Foster had treated Mrs. Fisher. Among the statements Mrs.

Fisher was alleged to have made was that she did not know the contents of the paper that Mrs. Foster had caused to be prepared for her to sign. If Mrs. Fisher was mentally unbalanced, any statement made by her in that connection if admissible at all, is only admissible to establish her mental derangement, and is not admissible to establish the truth of the statement itself. Mrs. Helms, the complainant, on the issue of mental incapacity, testified as follows:

"Q. How about her mental condition on that day? (December 22, 1934)

"A. Her health?

"Q. Her mind.

"A. That is what I say. She looked like she was just worried and her mind didn't seem like it was right at all.

"Q. Did she appear to be rational or normal?

"A. Yes.

"Q. You say she was rational?

"A. No.

"Q. Do you mean yes or no?

"A. I mean yes. She seemed all right only she was worried over the way she had been treated. She said she had papers drawed up on her that she didn't know what they meant, and she said it worried her.

"Q. In your conversation with her on that day, did she talk sensibly?

"A. Oh yes, she talked sensibly on that day."

There is no evidence tending to establish fraud or undue influence other than the fact that Mrs. Fisher was old and had previously made a will giving her sister all her property. This is not sufficient to overcome the testimony of disinterested witnesses declaring that the grantor was normal, and that she personally instructed the attorney, without the suggestion from any one, as to the disposition she desired to make of her property.

In *Bibby* v. *Thomas,* 165 Va. 248, 182 S. E. 226, it was held that extreme mental weakness will raise a presumption of imposition, even though such mental weakness stops short of legal incapacity, and that such weakness plus

grossly inadequate consideration may be sufficient for a court of equity to set aside an instrument on the application of the injured party or his legal representative.

██ The facts do not bring the case at bar within the principle stated. The great weight of the evidence shows that while Mrs. Fisher was old, she was not sick at the time she executed the instrument in question. She was normal mentally. She was able, without assistance, to attend to her usual affairs. Four witnesses, two of whom were disinterested, heard Mrs. Fisher instruct her attorney to draft an instrument conveying her property to Mrs. Foster. This instrument was acknowledged on the next day, before the trial justice, after it had been read to her for the second time.

The market value of the real estate described is not stated. The inference from the evidence is that it is worth comparatively little. Mrs. Foster did not know the full value of the consideration she was receiving from Mrs. Fisher, nor did she know how much or how little she would be compelled to spend in medicines and doctor's bills, besides the necessary expenditure for nursing, feeding, clothing and housing Mrs. Fisher. Whatever the cost, Mrs. Foster unconditionally bound herself to support and maintain Mrs. Fisher in the following language: "* * * to care for and keep me with care and comfort as one of the family during my declining years and feeble condition as long as I shall live, and give me a decent burial after the departure of my life. * * *"

The property described in the deed was Mrs. Fisher's. She had the right to do with it as she thought best. She chose to use it to purchase security, care and comfort for herself as long as she lived.

██ There is no failure of consideration. An abortive attempt was made to show that Mrs. Foster failed to perform her agreement. Mrs. Foster testified that Mrs. Fisher preferred to live alone in her own home so long as she was able to get around and care for herself. She agreed with Mrs. Foster that when she was not able to do this, she

would move into Mrs. Foster's home, where Mrs. Foster would give her more time and attention. Mrs. Foster either went or sent one of her children every day over to Mrs. Fisher's home to see what this old woman needed. About the middle of December, 1934, her stomach became upset and before Mrs. Foster could do anything for her, Mrs. Helms took charge. Notwithstanding this fact, Mrs. Foster paid the medical bills, burial expenses and was at all times ready and willing to give Mrs. Fisher the care and attention she had promised. No one could be required to do more.

Appellee's final contention is that the instrument is invalid because it is testamentary in character. The pertinent parts of the instrument bearing on this contention are:

"THIS DEED, made this 16th day of November, 1934, between Amanda Fisher, party of the first part, and Anna Kate Foster, party of the second part:

"WITNESSETH, that in consideration of the services of Anna Kate Foster, to care for and keep me with care and comfort as one of the family during my declining years and feeble condition as long as I shall live, and give me a decent burial after the departure of my life, I, Amanda Fisher, the said party of the first part, doth grant and convey unto Anna Kate Foster, party of the second part, with general warranty, * * * and all my personal property of every nature and kind, tangible and intangible, is hereby transferred and becomes the property as each of the above lots, at my death, with all interest and title to Anna Kate Foster, party of the second part, absolutely forever."

The deed also contains the covenants of general warranty, the signatures and seals of the grantor and grantee, and the jurat of the officer who took the acknowledgment.

This instrument is stated to be a deed on its face. It purports to transfer, *in praesenti*, the property described, for a valuable consideration. There was an unconditional delivery to the grantee and by her forthwith recorded. The only language used which even suggests a testamentary

characteristic is the clause "and becomes the property as each of the above lots, at my death, with all interest and title to Anna Kate Foster." This language considered with the whole instrument only postpones full enjoyment of the property described until the death of the grantor.

A will is ambulatory, revocable at the pleasure of the maker. The instrument in question is not revocable. It purports to pass, and does pass a present interest to the grantee.

In *Lightfoot's Ex'rs* v. *Colgin,* 5 Munf. (19 Va.) 42, it was held that "A deed of trust, if not revocable by the grantor, is not to be considered a will in disguise, on the grounds that nearly all his personal estate is thereby conveyed, and that he reserves to himself the possession and control of the property during his life."

In *Gentry* v. *Bailey,* 6 Gratt. (47 Va.) 594, 604, this is said: "Two circumstances must concur to render the gift testamentary in its nature; one is, that it is not to be substantially effective until his death; and the other is, that the husband does not divest himself of the capacity to recall it, and so resume to himself, or his estate, the ownership granted." These decisions are followed in *Hall* v. *Hall,* 109 Va. 117, 63 S. E. 420, 21 L. R. A. (N. S.) 533. For other authorities, see notes, 11 A. L. R. 60; 64 A. L. R. 468; 76 A. L. R. 638; 8 R. C. L. 931.

For the reasons stated, the decree of the trial court is reversed and the case dismissed.

*Reversed.*