## Richmond

Emma McGrue, Executrix, Etc., Et Al. v. Joan S. Brownfield.

January 16, 1961.

Record No. 5148.

Present, Eggleston, C. J., and Spratley, Buchanan, Whittle, Snead and I'Anson, JJ.

The opinion states the case.

*James H. Raby*, for the appellants.

*Harold H. Purcell* and *George P. Smith, Jr.*, for the appellee.

SNEAD, J., delivered the opinion of the court.

This suit in equity was instituted by Emma McGrue, executrix of the estate of Josephine Bradley, deceased; Emma McGrue, individually; and Roland Stewart (sometimes known as Stuart), the surviving son of Josephine Bradley, appellants. Its object was to set aside a deed, dated August 6, 1958, made by Josephine Bradley which conveyed subject to life estates reserved for herself and son 4 acres, more or less, together with improvements thereon, situated in Culpeper county to Joan S. Brownfield, appellee. The bill alleged that Josephine Bradley was not mentally competent to execute the deed; that her signature to it was fraudulently procured, and that there was no consideration for the conveyance. Testimony on behalf of the litigants was taken before S. A. Cunningham, Commissioner in Chancery, to whom the cause had been referred. He found in his report filed September 9, 1959, among other things, that Josephine Bradley on August 6, 1958, the day the deed was executed, had mental capacity to execute it; that there was no fraud in procuring her signature to the deed; that there was adequate consideration for the deed, and that the fee simple value of the property at the time of conveyance was between $4,500 and $5,000. By decree of December 7, 1959, the court below overruled complainants' exceptions to the report. It was ratified, approved and confirmed, and the deed was held to be valid. We granted complainants an appeal.

Appellants have resolved their assignments of error into two questions for our consideration: (1) Was Josephine Bradley mentally capable of executing the deed? and (2) Was adequate consideration given for the deed? They require that the evidence be stated in some detail.

Early in 1956, Edward S. Brownfield, a general contractor, entered into an agreement with Josephine Bradley to make certain repairs to the buildings on her premises for the sum of $400. On

March 6, 1956, after completion of the work, Josephine Bradley executed an installment note for $471.96, representing principal and interest, payable to the order of Brownfield in 36 monthly installments of $13.11 each. At the same time she executed for collateral a demand note payable to bearer for $400 with interest at 6 per centum per annum from date which was secured by a deed of trust given by her on the property. Brownfield discounted the installment note at The Culpeper National Bank where it was payable. The maker did not pay any installments which became due and Brownfield, who had endorsed the note, was required to pay the obligation held by the bank.

Brownfield made a number of visits to the home of Josephine Bradley in an effort to collect the debt. He was advised that she was going to sell part of the property, but the sale was not consummated. Later she said that she would attempt to get some financial aid from her relatives, but this did not materialize. In March, 1958, she informed Brownfield she could not raise the money but would convey the property to him in satisfaction of the debt, reserving life estates therein to herself and her son, Roland Stewart. Brownfield contacted his attorney, J. B. Hudson, Jr., who drafted the deed. When it was subsequently presented to her for execution she told Brownfield she would like to delay signing it until Emma McGrue arrived, whom she was expecting within a few weeks. This was agreeable to Brownfield.

On August 6, 1958, Brownfield was in Culpeper and he again called upon Josephine Bradley to ascertain what progress was being made to pay the debt. She advised him none had been made and that she saw nothing else to do except make the deed as she had previously suggested. She asked Brownfield if she could also reserve a life estate in the property for Emma McGrue, but this was not agreeable to him. Brownfield did not have with him the deed which had been previously prepared, so he contacted Hudson and another deed was prepared by him from an office copy he had. Hudson, who was a Commissioner in Chancery, returned with Brownfield to Josephine Bradley's residence where she executed the deed. It was acknowledged before Hudson, and her signature was witnessed by Hudson, Brownfield and Stewart. The deed provided that the payment of taxes and insurance was the obligation of the grantee.

The first witness called by appellants was Dr. Elijah Barber, who was Josephine Bradley's physician before and during her last illness

which began in August, 1957, and continued until her death on September 23, 1958. He testified that her physical condition from June, 1958, until her death was "very poor". He was asked on direct examination:

"Q. Would you say that from June, 1958 until she died she was capable of transacting any business?

"A. No, I would say this: That from June, 1958, at times from time to time she was incapable of transacting any business due to her physical condition because of senility, degeneration and poor circulation, which made her incapable from carrying on normal business.

"Q. She signed a paper purporting to be a deed in August, I think in 1958, and you say from June—Would you say in August, 1958, she was mentally capable of signing any deed?

"A. I would say she was not, no.

"Q. Now, her general attitude, you say she was eighty years old, did she act like a grown person or a child or how did she act?

"A. Well, one time she would be probably grown, the next time she would be a child.

"Q. Would it be her habit to do anything you would ask her to do, or what would she do?

"A. At times she would, at other times she wouldn't."

On cross-examination he said:

"Q. Dr. Barber, what was the diagnosis of her case? What did she die of?

"A. Cardio-vascular disease.

"Q. She had heart disease?

"A. She had heart disease, diseased blood vessells and liver.

"Q. And she had been suffering from that for sometime?

"A. Ten years, ten to fifteen years.

"Q. And you feel that at times she knew what she was doing and at times she didn't?

"A. That is the testimony I gave.

"Q. In other words she had lucid moments?

"A. Quite frequently, yes.

"Q. And like all elderly people, who have that condition, some days she would be getting along fairly well and other days she would not be getting along at all well?

"A. That is right."

Dr. Barber further testified that since he did not see the patient on August 6, 1958, he could not state whether she had a good day or a

bad one. His records disclosed that his nearest visits to that day were on the 3rd and 7th days of August, 1958.

Reverend Robert C. Davis, who resided in Washington, D. C. and was Josephine Bradley's pastor, said that from June 1958 until her death he visited her twice a week; that her condition was very serious; that she was very feeble and "like a child", and that he did not know anything about her signing the deed in question.

Ruth Walker, a neighbor, stated that she visited Josephine Bradley every day; that during the last three months of her life she was in the "baby stage" and her mental condition was "bad"; that in her opinion Josephine Bradley was not capable of transacting any business during August, 1958, due to the condition of her health, and that she was not present when the deed was executed.

Roland Stewart, age 66, testified that he had lived with his mother, Josephine Bradley, all of his life; that Brownfield came to the home on August 6, 1958, and told his mother he "was going to bring a deed"; that he left and returned with another gentleman (Hudson) whom he could not identify; that Brownfield helped sit his mother up in bed, steadied her hand and told her to sign the deed; that it was not read or explained to her; that he witnessed her signature, but did not know why, and that his mother was not capable of understanding the transaction, but he did not object or inform Brownfield or Hudson that she could not execute the deed. He further testified that he had no income; that his mother had a bank account which she drew on; that he did not know his mother had given a deed of trust on the property to secure payment of the debt incurred for the repairs made, and that he had never seen Brownfield before that day, but admitted he had made considerable repairs on the buildings.

Mortimer M. Marshall testified he was not in the real estate business, but had had experience in selling and appraising real property in Culpeper county. He fixed the fee simple value of the property at approximately $5,000. He did not think the reservation of the two life estates decreased its value.

G. W. Mitchell, treasurer of Culpeper county for 29 years, was called as a witness for appellee. He stated that the land was assessed for tax purposes at $120 and the buildings at $960; that the assessment was made in 1955, effective in 1956; that it was made on the ratio of 40 per cent of actual value, and that the reservation of life estates would normally decrease the value of the property.

Edward S. Brownfield testified as to the work done by him on the buildings, the taking of the notes and deed of trust, and the events leading up to the execution of the deed on August 6, 1958, as have been hereinabove related. He said that when he and Hudson arrived with the deed, Josephine Bradley was in bed; that she read the deed and it was read to her by them and fully explained; that she asked questions about it which were answered; that she asked if he would agree to continue the life estate to Emma McGrue and also pay her burial expenses and he informed her he would not, and that she was feeling "poorly" but she understood "one hundred per cent" what she was doing when she signed the deed. He further stated that he gave her no money; that the principal consideration for the deed was the cancellation of the debt, his agreement to pay taxes, insurance and keep the premises in repair; that his wife was made grantee as an act of benevolence, and that he learned after the notes and deed of trust were executed that Josephine Bradley had an incompetent husband, Augustus Bradley.

When Brownfield was asked on cross-examination why he didn't foreclose on the deed of trust, he said that it was contrary to Josephine Bradley's wishes; that he felt it was charitable not to do so, and also he did not think the property would bring enough to pay the debt because the title was questionable. He also said that he did not think he had steadied her hand when she signed the deed; that he had paid approximately $100 on back taxes and for insurance premiums, and that he had not released the deed of trust because suit was instituted before it was convenient for him to do so.

J. B. Hudson, Jr., a reputable attorney who has practiced his profession since 1949, testified that at the request of Brownfield he prepared the deed in question and went with him to the home of Josephine Bradley for the purpose of acknowledging her signature to it; that during the time the deed was being executed she was sitting on the edge of the bed; that in the presence of Roland Stewart the deed was read, explained and discussed at some length before she signed it, and that she asked questions with reference to the deed. He recalled specifically that she asked Brownfield if he would pay her burial expenses and he told her he could not do so. He further stated that both Josephine Bradley and Stewart were asked if they understood the transaction and they replied in the affirmative, and that he was definitely of the opinion that she had the mental capacity to comprehend the transaction, otherwise he would not have per-

mitted her to execute the instrument. He said the deed of trust was also discussed and she understood it would be satisfied. He was asked on cross-examination:

"Q. So, after you had read the deed to her finally she did sign it, is that true?

"A. You are saying, the manner in which you ask the question indicates to me that she was urged in some way to sign, 'finally she signed it'; that was not the situation at all. I might say this that at the time Josephine Stewart Brad*ely* signed the deed I was very definitely of the opinion that she understood everything that was contained in this deed, and that she understood everything about the life estates, the fact that after her death Roland could stay in one of the houses, and as to who paid the taxes and insurance."

Hudson also testified that after Josephine Bradley's death, Stewart came to his office and told him he was not present when the deed was read and explained to his mother, but he "corrected him and insisted that he was present during the entire time".

Hudson was questioned concerning his examination of the title to the property in 1956 in connection with the deed of trust. According to his notes made at the time, he said that on March 5, 1956, he had a telephone conversation with Josephine Bradley who advised him that she was married and had not been divorced from her husband, and that he had been confined in a mental institution in Massachusetts. He also stated that the deed, dated April 18, 1936, from the heirs of Albert Stewart conveying the property to Josephine Bradley recited the names of his heirs, and the information given therein was sufficient, if true, to convey a fee simple title. However, he made an exception as to the heirs of Albert Stewart in his report because Josephine Bradley had advised him that she had three other brothers and sisters who died in infancy. Lacking an affidavit he was unwilling to accept this statement.

Josephine Bradley made her last will and testament on June 16, 1953, and it was probated on October 3, 1958. She bequeathed $1.00 to her husband, Augustus Bradley, and gave her personal property to her son Roland Stewart. She also devised life estates in her real estate to her son and Emma McGrue, with remainder to Antioch Baptist Church, to be used as a parsonage.

When mental capacity is in issue, every case must depend on the circumstances surrounding the execution of the instrument involved, as the facts in one case seldom serve to illuminate or elucidate another. *Lohman* v. *Sherwood*, 181 Va. 594, 607, 26 S. E. 2d 74.

There is no particular degree of mental acumen to be prescribed as the measure of a person's capacity to execute a deed. If at the time of execution the grantor has sufficient mental capacity to understand the nature of the transaction he is entering into and agrees to its provisions, he is competent to execute the instrument. *Lohman* v. *Sherwood, supra,* p. 607.

The only persons present, other than Josephine Bradley, at the time the deed was executed were Stewart, Brownfield and Hudson. Stewart's testimony was in conflict with that of Brownfield and Hudson. The commissioner reported that his testimony should be given little, if any, weight because of his demeanor, manner of testifying and limited intelligence, and, therefore, he accepted the testimony of Brownfield and Hudson as to the events that took place. Their testimony was positive and definite that Josephine Bradley understood the nature and import of the transaction and was mentally competent at the time. Dr. Barber did testify that in his opinion she was not mentally capable of executing the deed. Yet he stated that she frequently had lucid intervals, that he did not see the patient between the 3rd and 7th days of August, 1958, and that he could not say whether she had a good or bad day on August 6, 1958, when the deed was executed. It was pointed out that grantor's signature to the deed was not legible, but this does not necessarily import that she lacked mental capacity to execute the instrument. We hold that the commissioner's finding that Josephine Bradley was mentally competent to execute the deed is supported by ample credible testimony.

█ The record is devoid of any evidence showing fraud in procuring Josephine Bradley's signature to the deed. If appellants are to prevail, their case must come under the doctrine expressed in *Fishburne* v. *Ferguson's Heirs,* 84 Va. 87, 110, 4 S. E. 575, wherein it is said:

"* * * [W]henever there is great weakness of mind in a person executing a conveyance of land, arising from age, sickness, or any other cause, though not amounting to absolute disqualification, and the consideration given for the property is grossly inadequate, a court of equity will upon proper and seasonable application of the injured party, or his representatives or heirs, interfere and set the conveyance aside, since from these circumstances, imposition or undue influence will be inferred." *Bibby* v. *Thomas,* 165 Va. 248, 253, 182 S. E. 226; *Cook* v. *Hayden,* 183 Va. 203, 223, 31 S. E. 2d 625.

Appellants have cited cases in which the doctrine has been applied. In those cases the grantees occupied a position of trust to the grantors, either as trustee or being closely related to grantor and acting as an advisor, or by residing in the same house with him. They are factually different from our case. Neither Brownfield nor the grantee occupied any such position.

In *Waddy* v. *Grimes*, 154 Va. 615, 153 S. E. 807, Grimes, who was ill and advanced in age, lived alone on premises he owned, which were valued at approximately $1,200. At the suggestion of his doctor, he was taken to the home of his nephew, Robert Waddy, in October, 1925, where he was cared for by Waddy and his wife until his death in April, 1926. Grimes was adjudged *non compos mentis* by the Circuit Court of Lancaster county on November 20, 1925, and Waddy was appointed and qualified as his committee. This appointment was never revoked. On March 6, 1926, Grimes conveyed his property to Waddy's wife, Annie, in consideration of the promise that they would take care of him as long as he lived and also pay two bills he owed amounting to approximately $50.

Suit was instituted by Grimes' daughter to set this deed aside as well as a deed from Annie and Robert Waddy to St. Paul Carter, and another from Carter to Mathew Waddy, trustee. It was alleged that Grimes lacked mental capacity to execute the deed; that the consideration paid was grossly inadequate, and that it was procured by fraud and undue influence. This court reversed the judgment of the lower court which set aside the deeds attacked. It was held, among other things, that the evidence showed Grimes was mentally competent at the time he executed the deed; that the care and kindness exhibited by Waddy and his wife to Grimes during his illness and their promise to support him do not constitute the exercise of fraud or undue influence, and that the consideration for the deed was not so grossly inadequate as to shock the conscience or to warrant the inference that undue influence was exercised to procure the deed.

In the present case the evidence does not show "great weakness of mind" on grantor's part at the time she executed the deed. But assuming it does, the consideration for the conveyance must be "grossly inadequate". Mere inadequacy of consideration, in the absence of fraud, is not sufficient to invalidate such a conveyance. However, inadequacy must not be so great as to shock the moral sense of mankind. 5 M. J., Deeds, § 10, p. 698.

Consideration for a deed cannot always be measured in dollars

and cents. Here the consideration was satisfaction of the $400 note with interest from March 6, 1956, payment of taxes in arrears and insurance premiums which amounted to approximately $100. The grantee was obligated to pay future taxes, insurance premiums and keep the premises in repair for an indefinite period as the property was conveyed subject to a life estate for the grantor and a life estate in one of the houses for her son, Roland Stewart, who was 66 years old at the time. It can be reasonably expected that Stewart might live for many years. Moreover, Augustus Bradley, husband of Josephine Bradley, did not execute the deed. The record does not show whether he is dead or alive, but if alive he has a right of curtesy in the property. There is also a possibility of other outstanding interests. These factors unquestionably adversely affect the sale value of the property. Under all of these circumstances, we cannot say that the consideration for the deed was so "grossly inadequate" as to shock the conscience or to warrant an inference that undue influence was exercised to procure the deed. As suggested by appellee, if Brownfield had refused to accept grantor's proposition to convey the property, foreclosed under the deed of trust, and caused her and Stewart to vacate, it would have more likely shocked the sense of mankind.

Appellants complain because the deed was made to Brownfield's wife instead of himself. We do not attach importance to this fact, for it is common knowledge that husbands frequently cause property acquired by them to be conveyed to their wives for benevolent purposes. The life estates reserved to the grantor and her son were not impaired by conveying the property to appellee. Furthermore, had the property been conveyed to Brownfield there was nothing to prevent him from conveying it subsequently to his wife.

The commissioner saw and heard all of the witnesses testify, and his conclusions have been approved, after a review of the record, by a judgment of the trial court. That judgment comes to us with a presumption it is correct.

As was said in *Hudson* v. *Clark*, 200 Va. 325, 329, 106 S. E. 2d 133:

"* * * [I]t is established in Virginia that the conclusions of a commissioner, where the evidence has been taken in his presence, should be sustained unless it plainly appears, upon a fair and full review, that the weight of the evidence is contrary to his findings. Although the trial court is given power of review over his findings, it cannot

arbitrarily disturb the report, if it is supported by sufficient proof. Virginia Code § 8-250. *Leckie* v. *Lynchburg Trust, Etc., Bank,* 191 Va. 360, 364, 60 S. E. 2d 923; *Reese* v. *Reese,* 196 Va. 1028, 1036, 1037, 87 S. E. 2d 133; 16 M. J., References and Commissioners, § 33, pages 29, 30, 31, and numerous cases cited."

We find that the conclusions of the commissioner, approved by the trial court, are supported by sufficient credible evidence, and the decree appealed from is

*Affirmed.*

EGGLESTON, C. J., AND SPRATLEY, J., dissenting.

SPRATLEY, J., dissenting:

I find no difficulty in disagreeing with the conclusion of the majority.. It seems to me that a fair evaluation of all the evidence presents a transaction which would trouble one of good conscience when he tries to sleep at night.

Here, we have a Negro woman, 80-odd years of age, who had been suffering from heart disease, diseased liver and blood vessels from ten to fifteen years, senile, and sick in bed, as the grantor in a deed, which conveyed all her real estate valued at $5,000.00 to the wife of a man to whom she was indebted for a sum less than $500.00.

We have the evidence of a qualified physician, who had attended her for fifteen years before her death in the month following the execution of the deed. He lived across the street from her, had "quite often" visited her during that period, and ministered to her needs. He saw her on August 3rd and again on August 7th, the day after the deed was signed. He testified that because of a progressive physical and mental deterioration, she sometimes acted like a grown person and other times like a child; and that from June, 1958, until her death she was incapable of carrying on normal business or engaging in a good general conversation.

We have the evidence of the pastor of her church, who visited her twice a week, who said that from June, 1958, she was very feeble and just like a child, willing to do anything she was asked to do.

We have the testimony of Ruth Walker, who lived across the street from Mrs. Bradley, had known her all her life, and had visited her every day for the two years preceding her death; that

Mrs. Bradley was getting worse all the time; that during the three months prior to August 6th, 1958, she was in the "baby stage;" and that because of the condition of her health and mind, she was incapable of transacting any business in the month of August, 1958.

We may disregard the evidence of Mrs. Bradley's son, 66 years of age, because of his limited intelligence, except to note that when Brownfield came to get her to sign the deed, she was in bed and so sick and feeble that she had to be held up and her hand guided to make her signature.

Other witnesses confirm the fact that she was in bed, and Brownfield said that she was lying prone when she made her signature. The deed presented as an exhibit shows her signature as a mere "scrawl."

On the other hand, the husband of the grantee, a general contractor for more than fifteen years, said that Mrs. Bradley, whom he had seen only a limited number of times, fully comprehended the situation when she signed the deed. He is supported by J. S. Hudson, his attorney, the notary who acknowledged the grantor's signature, who had seen Mrs. Bradley only on August 6th, 1958.

It will be noted that after Mrs. Bradley had earlier refused to sign a deed, Brownfield again went to her home, found her sick in bed, and without money to pay on her notes; that helpless and weak, she suggested that she reserve a life estate in the property for herself, her son, and Emma McGrue; that he pay her funeral expenses; that Brownfield refused, except as to the reservation of a life estate for her and her son; that he was amply secured for the debt to him, which did not become fully due until 1959; and that Brownfield insisted upon the transaction whereby his wife got two buildings, a 6-story house and the 3-story house with the benefit of the repairs thereon, represented by the debt to him, and more than four acres of land on a primary State Highway near the Town of Culpeper, a transaction which yielded ten times the amount of the debt payable to him.

The evidence of the three witnesses who had full opportunity over the years to observe that Mrs. Bradley had a great weakness of mind, arising from age and illness, and the manifest fact that the consideration given for her property was grossly inadequate force the conclusion that she was imposed upon or unduly influenced to execute the deed. *Fishburne* v. *Ferguson*, 84 Va. 87, 110, 4 S. E. 575; *Bibby* v. *Thomas*, 165 Va. 248, 253, 182 S. E. 226; *Cook* v. *Hayden*, 183 Va.

203, 223, 31 S. E. 2d 625, and cf. *Jackson* v. *Seymour*, 193 Va. 735, 741, 71 S. E. 2d 181.

The contention that there was a serious cloud on the title of the property because of the supposed existence of grantor's husband, who had not been seen or heard of for years, and the reservation of the two life estates, is tenuous and mere shadow boxing. One life estate terminated in about six weeks and the other was limited to a building to be selected by the grantee.

"It is fundamental that, notwithstanding the weight due a commissioner's report and the respect which is accorded his findings, neither the trial court nor this court should avoid the duty of weighing the evidence when its sufficiency is fairly challenged. * * *" *Gilmer* v. *Brown*, 186 Va. 630, 642, 44 S. E. 2d 16; *Hoffecker* v. *Hoffecker*, 200 Va. 119, 124, 104 S. E. 2d 771.

When upon a fair and full review of the evidence according to correct principles of law it appears that the weight is contrary to the findings of the commissioner, it is the duty of the chancellor and this Court to disapprove the conclusion of the commissioner. *Leckie* v. *Lynchburg Trust, etc., Bank*, 191 Va. 360, 364, 60 S. E. 2d 923.

The chancellor does not delegate his judicial function to a commissioner in chancery. The commissioner is appointed for the purpose of assisting the chancellor and not to supplant or replace him. It is the duty of the chancellor to confirm or reject the commissioner's report according to the view which he entertains of the law and the evidence. Section 8-250, Code 1950. *Raiford* v. *Raiford*, 193 Va. 221, 229, 230, 68 S. E. 2d 888.

Mr. Justice Snead, in *Hoffecker* v. *Hoffecker*, 200 Va., *supra*, at page 125, said:

"Thus it is manifest our duty is to evaluate the evidence under a correct application of the law to determine whether or not it supports the findings of the commissioner or the conclusions of the chancellor."

When we do this the answer seems clear. The transaction shocks my sense of justice and fair play.

Upon the foregoing principles, long established, I would hold the deed of August 6, 1958, invalid; and remand the case to the trial court for further proceedings in conformity with the above views.

CHIEF JUSTICE JOHN W. EGGLESTON joins in this dissent.