Present: All the Justices

FRIENDLY ICE CREAM
CORPORATION, ET AL.

v. Record No. 031640     OPINION BY JUSTICE ELIZABETH B. LACY
                                        June 10, 2004
BEATRICE F. BECKNER

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Gaylord L. Finch, Jr., Judge

In this appeal we review the chancellor's decree rescinding an amendment to a lease because the lease amendment was the result of undue influence.

## Facts

Beatrice Beckner and her husband entered into a commercial lease with Friendly Ice Cream Corporation (Friendly) allowing Friendly to build and operate a retail store on property owned by the Beckners. The lease commenced in 1976 with an original term of 15 years. Friendly could exercise five renewal options of five years each. If all five options were exercised, the lease would terminate in 2016. In addition to a monthly base rent, the lease required an annual payment of two percent of the store's annual gross sales exceeding $275,000 (percentage rent). FriendCo Restaurants, Inc. (FriendCo) operated the retail ice cream store through a sublease with Friendly. In 2001, the lease generated a base rent of $1,105.00 per month and a percentage rent of $7,984.68, for a total income of approximately $21,200.00.

In December 2001, Friendly and FriendCo decided to close the retail store. Fourteen years remained on the lease if the renewal option were fully exercised. Riggs Bank, N.A. (Riggs), among others, expressed an interest in acquiring Friendly's interest in the lease. Riggs planned to demolish the existing retail building and build a bank building on the property. Riggs was willing to pay Friendly approximately $800,000 for terminating the sublease and assigning the lease to Riggs if the lease were amended to relieve Riggs from payment of the percentage rent.

On December 26, 2001, Sandra L. Hughes, Vice-President and Deputy General Counsel for FriendCo, wrote to the Beckners seeking their consent to the assignment of the lease to Riggs, to the proposed redevelopment of the property, and to an agreement that the percentage rent requirement would not apply to Riggs' use of the property as a bank. On January 3, 2002, in response to a telephone call from Mrs. Beckner, Hughes went to Mrs. Beckner's home and discussed the provisions of a proposed amendment to the lease that would meet Riggs' conditions for the lease assignment. At that meeting Mrs. Beckner, then widowed and 80 years old, told Hughes that her lawyer was Norman Hammer.

Hughes contacted Hammer and, at Hammer's request, sent him a letter dated January 25, 2002, setting out the history

2

of payments made on the percentage rent, offering to increase the base rate by $5,000 a year, and proposing an amendment to the lease eliminating the percentage rent. Hammer replied on February 20, stating that he had no counter offer and that he wanted to confer with Mrs. Beckner's son, Robert O. Beckner.

In a February 27 telephone call to Hughes, Mrs. Beckner stated that Hammer was no longer her attorney and that she wanted to meet with Hughes to discuss the amendment to the lease. Hughes went to Mrs. Beckner's home and discussed the terms of the proposed amendment to the lease, including the offer to increase the annual base rent by $5,000. Mrs. Beckner replied that she wanted the base rate increased by $8,940 a year, from $1,105 per month to $1,850 per month. Hughes agreed to submit Mrs. Beckner's proposal to Friendly.

On February 28, Hammer sent a facsimile to Hughes instructing Hughes not to contact Mrs. Beckner directly and terming the "present offer" unacceptable. Hughes replied by facsimile on March 1, telling Hammer that she had met with Mrs. Beckner at Mrs. Beckner's request; that Mrs. Beckner stated that Hammer no longer represented Mrs. Beckner; that Hughes was a principal of FriendCo, the subtenant; and that "principals may talk to one another at any time, without going through lawyers if they so choose."

Hammer met with Mrs. Beckner on March 7, 2002 to discuss the amendment to the lease and his representation of her. Also present at the meeting were Robert Beckner, Clyde R. Christopherson – a lawyer who had also represented Mrs. Beckner, and Leroy Jackson, Mrs. Beckner's long-time friend and insurance agent. Mrs. Beckner agreed that Hammer should negotiate with Friendly on her behalf regarding the proposed amended lease. Christopherson drafted a letter reflecting this decision and, after reviewing the letter with Mrs. Beckner on March 8, sent the letter to Hughes' superior, David J. Norman.

Mrs. Beckner telephoned Hughes on Friday, March 8, reiterated her desire to deal directly with Hughes, and asked if Friendly had responded to the increase in base rent that Mrs. Beckner had requested. Hughes told Mrs. Beckner that Friendly had agreed to the increase. Although Mrs. Beckner wanted to sign the amendment to the lease immediately, Hughes could not meet with her until Monday, March 11. Hughes sent Mrs. Beckner a copy of the amendment to the lease along with a copy of Christopherson's March 8 letter and the facsimile exchanges between Hammer and Hughes on February 28 and March 1.

On March 11, Hughes arrived at Mrs. Beckner's home, reviewed the amendment to the lease with her, and then, at

4

Mrs. Beckner's direction, went with her to the bank where a bank employee with whom Mrs. Beckner had dealt in the past notarized her signature on the documents.  Hughes then presented Mrs. Beckner with a letter Hughes had drafted for Mrs. Beckner's signature stating that Mrs. Beckner wanted to deal directly with Hughes.  Mrs. Beckner signed the letter.

Shortly thereafter, Robert Beckner informed Hughes and Norman that he was concerned about his mother's actions. After receiving copies of the documents Mrs. Beckner had signed, Christopherson wrote Norman indicating Christopherson considered the documents to be invalid and that the documents should be resubmitted to Mrs. Beckner for further consideration.

## Proceeding

On March 22, 2002, Mrs. Beckner filed a bill of complaint against Friendly and FriendCo seeking rescission of the amendment to the lease on four grounds:  fraud, gross inadequacy of consideration, unjust enrichment, and undue influence, Counts I through IV, respectively.[1]  The fraud count was dismissed by agreed order prior to trial and Mrs. Beckner abandoned the unjust enrichment count at trial.  Friendly and FriendCo (collectively "Friendly's") filed a motion for

---

[1] A third defendant, DaveCo. Restaurants, Inc., was dismissed with prejudice.

5

summary judgment asserting that Mrs. Beckner was not entitled to rescission because she had acquiesced to the terms of the amended lease when she cashed checks she received pursuant to the terms of the amended lease. The chancellor denied this motion as not appropriate for summary judgment.

Following an ore tenus hearing, the chancellor entered a decree in favor of Mrs. Beckner on Counts II and IV. The chancellor found that the amendment to the lease was the product of undue influence because Mrs. Beckner produced clear and convincing evidence that she suffered from great weakness of mind, Hughes had a confidential relationship with her consisting of a formal and informal relationship regarding business matters, and the consideration for the amendment to the lease was grossly inadequate and occurred in suspicious circumstances. The chancellor rescinded the amendment to the lease and required Mrs. Beckner to pay $5,888.23, the amount she received under the amended lease exceeding that which she would have received prior to the amendment. We awarded Friendly's an appeal.

### Count IV — Undue Influence

On appeal, Friendly's raises five assignments of error. We first consider the three assignments of error that challenge the chancellor's action rescinding the lease amendment based on its finding of undue influence.

A court of equity will not set aside a contract because it is "rash, improvident or [a] hard bargain" but equity will act if the circumstances raise the inference that the contract was the result of imposition, deception, or undue influence. Payne v. Simmons, 232 Va. 379, 384, 350 S.E.2d 637, 640 (1986) (quoting Long v. Harrison, 134 Va. 424, 441-42, 114 S.E. 656, 661-62 (1922)); Jackson v. Seymour, 193 Va. 735, 740-41, 71 S.E.2d 181, 185 (1952). To set aside a deed or contract on the basis of undue influence requires a showing that the free agency of the contracting party has been destroyed. Tabb v. Willis, 155 Va. 836, 858, 156 S.E. 556, 563 (1931); Jenkins v. Trice, 152 Va. 411, 429, 147 S.E. 251, 257 (1929). Because undue influence is a species of fraud, the person seeking to set aside the contract must prove undue influence by clear and convincing evidence. Redford v. Booker, 166 Va. 561, 574, 185 S.E. 879, 885 (1936).

Direct proof of undue influence is often difficult to produce. In the seminal case of Fishburne v. Ferguson, 84 Va. 87, 111, 4 S.E. 575, 582 (1887), however, this Court identified two situations which we considered sufficient to show that a contracting party's free agency was destroyed, and, once established, shift the burden of production to the proponent of the contract. The first involved the mental

7

state of the contracting party and the amount of consideration:

> [W]here . . . great weakness of mind concurs with gross inadequacy of consideration, or circumstances of suspicion, the transaction will be presumed to have been brought about by undue influence.

Id. Thus, if the party seeking rescission of the deed or contract produces clear and convincing evidence of great weakness of mind and grossly inadequate consideration or suspicious circumstances, he has established a prima facie case of undue influence and, absent sufficient rebuttal evidence, is entitled to rescission of the document. See also Payne, 232 Va. at 384-86, 350 S.E.2d at 640-41 (deed rescinded based upon grantor's diminished mental capacity and the fact that $5,000, without the grantor retaining a life tenancy was grossly inadequate consideration); McGrue v. Brownfield, 202 Va. 418, 425-27, 117 S.E.2d 701, 706-08 (1961) (rescission unavailable absent weakness of mind where conveyance of property for cancellation of $400 debt secured by deed of trust was not grossly inadequate consideration); Foster v. Helms, 169 Va. 634, 643-45, 194 S.E. 799, 802-03 (1938) (rescission not available because grantor competent and agreement to care for grantor was not grossly inadequate consideration); Bibby v. Thomas, 165 Va. 248, 253, 182 S.E. 226, 228-29 (1935) (deed by

8

elderly, infirm, illiterate woman, conveying property valued at $1,200 to caretaker for $100 was rescinded).

The second instance Fishburne identified arises when a confidential relationship exists between the grantor and proponent of the instrument:

> [W]here one person stands in a relation of special confidence towards another, so as to acquire an habitual influence over him, he cannot accept from such person a personal benefit without exposing himself to the risk, in a degree proportioned to the nature of their connection, of having it set aside as unduly obtained.

84 Va. at 112-13, 4 S.E. at 582. Here, equity considers the benefit to the person in the relation of special confidence presumptively invalid and, once that relationship and benefit is established, the burden of going forward with evidence that the transaction was fair rests on the proponent of the transaction. See also Economopoulos v. Kolaitis, 259 Va. 806, 812, 528 S.E.2d 714, 718 (2000) (the presence of a confidential relationship creates a presumption of fraud.); Nuckols v. Nuckols, 228 Va. 25, 34-38, 320 S.E.2d 734, 739-41 (1984) (one seeking rescission has burden to prove confidential or fiduciary relationship or other direction and control depriving grantor of free volition); Nicholson v. Shockey, 192 Va. 270, 275, 64 S.E.2d 813, 816 (1951) (gift from mother to son acting as attorney and confidential advisor

9

in transaction is "presumptively invalid;" donee must overcome this presumption by clear and convincing evidence); Waddy v. Grimes, 154 Va. 615, 647, 153 S.E. 807, 817 (1930) (where a deed is made to the wife of the grantor's duly appointed committee, the burden of proving that the transactions are valid falls on the party seeking to uphold the deed).

Initially, we note that in this case the trial court stated that Mrs. Beckner had established "the three elements of [the undue influence] presumption." We assume this refers to the statement in Martin v. Phillips, 235 Va. 523, 528, 369 S.E.2d 397, 400 (1988), that the presumption of undue influence arises if weakness of mind, grossly inadequate consideration or suspicious circumstances, and a fiduciary or confidential relationship are established by clear and convincing evidence. As we have discussed, the presumption of undue influence arises and the burden of going forward with the evidence shifts when weakness of mind and grossly inadequate consideration or suspicious circumstances are shown or when a confidential relationship is established. To the extent Martin requires all three elements to be shown before the presumption of undue influence can be invoked, it is overruled. Nevertheless, under the principles established in Fishburne and subsequent cases, the chancellor's findings in this case, if supported by the record, entitled Mrs. Beckner to the presumption of undue

10

influence under either situation — a confidential relationship or weakness of mind and grossly inadequate consideration or suspicious circumstances.

We now review the chancellor's findings, applying established principles of appellate review. We must accept the chancellor's findings of fact unless they are plainly wrong or without evidence to support them. The Dunbar Group, LLC v. Tignor, 267 Va. 361, 367, 593 S.E.2d 216, 219 (2004).

### A.  Confidential Relationship

We begin our review by considering whether the evidence supports the finding that Hughes had a confidential relationship with Mrs. Beckner regarding matters of business. The chancellor did not identify any evidence upon which he based his finding. Mrs. Beckner argues, however, that the requisite confidential relationship existed because Hughes took "actions expressly designed to . . . ingratiate[ ] herself with Mrs. Beckner to the exclusion of Mrs. Beckner's attorneys" and "acted virtually as counsel to Mrs. Beckner, while adverse to her interests" by giving Mrs. Beckner legal advice in explaining sections of the lease and proposed amendment.

We have described a confidential relationship as a relationship that is

11

"not confined to any specific association of the parties; it is one wherein a party is bound to act for the benefit of another, and can take no advantage to himself.  It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible."

Trust alone, however, is not sufficient. We trust most men with whom we deal.  There must be something reciprocal in the relationship before the rule can be invoked.  Before liability can be fastened upon one there must have been something in the course of dealings for which he was in part responsible that induced another to lean upon him, and from which it can be inferred that the ordinary right to contract had been surrendered. If this were not true a reputation for fair dealing would be a liability and an unsavory one an asset.

Hancock v. Anderson, 160 Va. 225, 240-41, 168 S.E. 458, 463 (1933) (citation omitted).  We have also held that a confidential relationship exists between a parent and child when accompanied by an attorney-client or principal-agent relationship, or between family members when the family member provides financial advice or handles the finances of another family member.  Economopoulos, 259 Va. at 812-13, 528 S.E.2d at 718.

Mrs. Beckner does not suggest that an attorney-client or any other fiduciary relationship existed between herself and Hughes; rather Mrs. Beckner suggests that the confidential relationship arose from Hughes' "legal advice" on the terms of

12

the lease and amendment and from Hughes' attempt to "exclude all others" including Hammer and Christopherson.  Finally, Mrs. Beckner argues that the evidence shows that she "liked and trusted" Hughes and did not think Hughes "would attempt to cheat her."  These conclusions are neither sufficient to establish a confidential relationship nor are they supported by the evidence.

The record demonstrates that the relationship between Mrs. Beckner and Hughes had the hallmarks of a business relationship, not those of a confidential relationship.  There was no history of financial interaction of any kind between Hughes and Mrs. Beckner.  Compare Nicholson, 192 Va. at 278, 64 S.E.2d at 818 (business relationship between mother and son existed over period of years); Jackson, 193 Va. at 737-38, 71 S.E.2d at 183 (brother managed and rented sister's land).  The relationship was of short duration, consisting of approximately eight contacts beginning on December 26, 2001 and ending on March 11, 2002, six of which Mrs. Beckner initiated.  When Mrs. Beckner initially told Hughes that Hammer was representing her, Hughes contacted Hammer and sent him a copy of the proposed amendment to the lease.

Mrs. Beckner testified that she knew Hughes was "with Friendly's," that the percentage rent under the lease was going down every year, that some Friendly's stores were

13

closing in the area, and that she would not receive any percentage rent if the store on her property closed. The record is clear that during the course of this three-month relationship, Mrs. Beckner did not allow Hughes to make decisions for her regarding the second amendment to the lease. In fact, Mrs. Beckner negotiated a monthly base rent higher than the rate Hughes proposed. Mrs. Beckner received a copy of the proposed amendment to the lease in advance of signing it and she chose the bank and bank employee who notarized her signatures on the amendment to the lease.

Hughes testified that she considered Mrs. Beckner to be her landlord and that negotiations regarding the second amendment to the lease involved "[d]ealing with the other side."

The relationship Hughes and Mrs. Beckner described did not involve any requirement that Hughes act on Mrs. Beckner's behalf, nor did either party presume that Hughes should or would do so. Although Mrs. Beckner may have liked and trusted Hughes, such trust alone is insufficient to establish a confidential relationship. Hancock, 160 Va. at 240-41, 168 S.E. at 463. The record at most reflects a commercial relationship in which the parties trusted each other.

Mrs. Beckner failed to carry her burden of proof to show she and Hughes had a confidential relationship, formal or

14

informal, regarding matters of business.  Thus, she was not entitled to the presumption of undue influence and would not be entitled to judgment in her favor on this basis.

### B.  Mental Status and Consideration

The chancellor also found that Mrs. Beckner was entitled to a presumption of undue influence because she suffered from "great weakness of mind," and that the consideration she received was grossly inadequate and the transaction occurred under suspicious circumstances.  Again, although the chancellor did not identify the evidence upon which he based these findings, Mrs. Beckner points to a number of factors which she asserts support the chancellor's findings.

Beginning with the adequacy of the consideration, Mrs. Beckner first claims that under the original or amended lease, the base rent was "significantly below prevailing market rates."  Mrs. Beckner claimed that the rental value of the property "had risen dramatically" and, according to her expert witness, the current fair market rental value would be between approximately $5,000 and $8,000 a month.  However, Mrs. Beckner's expert did not consider the impact the outstanding lease would have on the fair market rental value of the property.  The chancellor, while refusing to strike the testimony of this expert, considered it "weightless."  We agree with the chancellor that evidence of current fair market

15

rental value without consideration of the existence of the lease or its conditions is not probative of whether the consideration for the amendment to the lease is grossly inadequate.

Next, Mrs. Beckner argues that the consideration was grossly inadequate because the increase in base rent contained in the amendment did not significantly increase the annual amount she received compared to the aggregate amount of base and percentage rent she received under the lease before the amendment. The base rent in the amended lease produced only $80 a month more than she received in 2001 from the combined base and percentage rents, thereby making the consideration received grossly inadequate, according to Mrs. Beckner.

We disagree. The increase in the base rate was in an amount Mrs. Beckner specifically requested. Over the likely lifetime of the amended lease, Mrs. Beckner would receive $310,800 in base rent, $125,160 more than she would have received in base rent without the amendment. The record also shows that the percentage rent in 2001 declined from the prior year. There is no evidence in the record that the value of percentage rent would remain at 2001 levels or would increase. Although Mrs. Beckner labels as speculative the suggestion that Friendly's would or could close the retail store, thereby discontinuing the obligation to pay percentage rent, the

16

uncontradicted evidence was that Friendly's had decided to close the store and that Mrs. Beckner was aware of that decision. Mrs. Beckner testified that she understood that, if the store closed, she would no longer receive any percentage rent. Thus, the increase in base rent was not grossly inadequate in light of the additional income it would produce and the uncertainty of the amount or continuation of revenue from the percentage rent.

Mrs. Beckner next argues that the possibility that she might own a bank building valued at $800,000 at the end of the lease period should not be included as part of the consideration because it also was speculative. Here again the uncontradicted evidence was that, if the lease was amended, Riggs planned to build such a building. This potential asset was a known part of the business transaction and, in the absence of fraud, may be considered as part of the benefit Mrs. Beckner received from agreeing to the lease amendment.

Finally, Mrs. Beckner asserts that the appropriate comparison of "value exchanged" is to compare the additional $80 per month Mrs. Beckner would receive under the amendment with the $800,000 Friendly's would receive for the assignment of the lease to Riggs. This disparity, she maintains, shows that the consideration she received was grossly inadequate. The amount Friendly's would receive from Riggs to assign the

17

lease is irrelevant to the adequacy of the consideration Mrs. Beckner received. Mrs. Beckner could not recover any amount from Riggs because she could not assign the lease to Riggs. The lease had, at a minimum, four years remaining, with the potential to extend, if the tenant so desired, to fourteen years, and contained no provisions for termination by the landlord other than for nonpayment of rent or insolvency of the tenant. Therefore, the value of Mrs. Beckner's consideration must be measured not simply in the amount of increase in base rent but also in light of the rights that she possessed regarding the property and her options at the time of the amendment.

Consideration is grossly inadequate when the " 'inequality [is] so strong, gross and manifest that it must be impossible to state it to a [person] of common sense without producing an exclamation at the inequality of it . . . .' " Jackson, 193 Va. at 741, 71 S.E.2d at 185 (quoting Gwynne v. Heaton, 1 Bro. Ch. 1, 9, 28 Eng. Rep. 949 (1778)). That others could have bargained for a higher base rent or secured more favorable terms for the execution of the lease amendment does not affect the determination of grossly inadequate consideration. In this case, by executing the amendment to the lease, Mrs. Beckner received an annual increase of $8,940 in base rent regardless of whether the

18

lease was assigned to another party and whether any business was operating on the property. She also acquired the possibility of owning the new bank building at the end of the lease. This record does not support a finding that the consideration Mrs. Beckner received was grossly inadequate.

Mrs. Beckner also asserts the chancellor was justified in finding that the transaction occurred under suspicious circumstances because Hughes did not further investigate whether Mrs. Beckner was represented by counsel following Christopherson's March 8 letter and because Hughes drafted a letter for Mrs. Beckner's signature stating that Mrs. Beckner wanted to deal with Hughes directly. As noted above, the record clearly shows that Mrs. Beckner herself initiated all but two of the contacts with Hughes. Mrs. Beckner's active participation in the negotiations regarding the lease amendment belies the existence of circumstances that would give rise to a level of suspicion sufficient to support the presumption of undue influence and rescission of the amendment.

We need not address the chancellor's finding that Mrs. Beckner suffered from great weakness of mind because even assuming that the finding is supported by the record, weakness of mind alone will not entitle Mrs. Beckner to rescission.

McGrue, 202 Va. at 426, 117 S.E.2d at 707, Fishburne, 84 Va. at 111, 4 S.E. at 582.

Because the record is insufficient to support the chancellor's findings that Mrs. Beckner had a confidential relationship with Hughes and that the consideration she received was grossly inadequate or the transaction occurred under suspicious circumstances, Mrs. Beckner was not entitled to a presumption of undue influence.  Therefore, the chancellor erred in rendering judgment in favor of Mrs. Beckner on Count  IV, Undue Influence.

### Count II – Grossly Inadequate Consideration

The chancellor also entered judgment in Mrs. Beckner's favor on Count II of her Bill of Complaint – grossly inadequate consideration.  Substantial failure of consideration is a recognized ground for rescission of a contract because such gross inadequacy is clear evidence of fraud.  Texas Co. v. Northup, 154 Va. 428, 442-45, 153 S.E. 659, 663-64 (1930); Broaddus v. Broaddus, 144 Va. 727, 750, 130 S.E. 794, 801 (1925).  The standard for this claim is the same as claims of undue influence based on grossly inadequate consideration: "[a]n inequality so strong, gross and manifest that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it."  Texas Co., 154 Va. at 443, 153 S.E. at 663, (quoting Gwynne, 1 Bro. Ch.

20

at 9).  Finally, because gross inadequacy is based on fraud, it must be shown by clear and convincing evidence.  Id.

We have already determined in considering Mrs. Beckner's claim of undue influence that the record did not support a finding of grossly inadequate compensation.  Applying the same standard to her claims in this Count, we conclude that the chancellor erred in entering judgment in favor of Mrs. Beckner on Count II because the consideration was not grossly inadequate.

Accordingly, for the reasons stated, we will reverse the trial court's decree rescinding the amendment to the lease and requiring repayment of funds by Mrs. Beckner.[2]

Reversed and final judgment.

---

[2] In light of this determination, we need not address the remaining assignments of error.

21