PRESENT: All the Justices

LAWRENCE E. GELBER, CO-EXECUTOR
OF THE ESTATE OF BEVERLY E. GELBER,
DECEASED, AND CO-TRUSTEE OF THE
BEVERLY E. GELBER TRUST U/A DATED
DECEMBER 1, 2010, AS RESTATED AND
AMENDED, ET AL.

                                                      OPINION BY

v. Record No. 160500              JUSTICE ELIZABETH A. McCLANAHAN
                                                     June 22, 2017

MERYL ANN GLOCK

FROM THE CIRCUIT COURT OF HENRICO COUNTY
Gary A. Hicks, Judge

This case involves the validity of instruments executed by Beverly E. Gelber ("Mrs. Gelber") two months prior to her death and purporting to convey her home and personal property to her daughter, Meryl Glock. Lawrence ("Larry") E. Gelber and Darlene A. Fleischmann, the executors of Mrs. Gelber's estate, who are also her children, contend that Meryl wrongfully induced Mrs. Gelber to execute a deed of gift and bill of sale through undue influence and fraud.[1] They also assert that the bill of sale, executed by Mrs. Gelber in her individual capacity, was of no effect because Mrs. Gelber's personal property was held in trust.

The Executors challenge the circuit court's rulings denying their motion for partial summary judgment on the issue of Mrs. Gelber's execution of the bill of sale in her individual capacity and granting Meryl's motion to strike the Executors' evidence at trial in support of their claims of undue influence, promissory fraud, and civil conspiracy. The Executors also challenge the circuit court's rulings on the exclusion from evidence of Mrs. Gelber's declarations

---

[1] For clarity, the members of Mrs. Gelber's family are referred to herein by their first names. Larry and Darlene are referred to collectively as "the Executors."

disavowing the property transfers and the exclusion from evidence of records of real estate tax assessments on Mrs. Gelber's home.

Although we conclude that the circuit court did not err in denying the motion for partial summary judgment on the issue of title and possession of Mrs. Gelber's personal property, in excluding records of real estate tax assessments on Mrs. Gelber's home, and in granting the motion to strike the Executors' evidence on the civil conspiracy claims, we hold that the circuit court committed error in excluding from evidence the declarations made by Mrs. Gelber disavowing the property transfers and in granting the motion to strike the Executors' evidence on their claims for undue influence and promissory fraud.

I.   BACKGROUND

On December 1, 2010, Mrs. Gelber executed several estate planning documents, including a will and trust agreement.  The 2010 will revoked any other wills, which included a previous will that had been executed by Mrs. Gelber in 2009, and gave Mrs. Gelber's real and personal property to her trustee under the 2010 trust agreement.  The 2010 trust agreement named Mrs. Gelber as the trustee and amended a trust agreement previously executed by her in 2009.  The 2010 trust agreement directed that upon Mrs. Gelber's death, the successor trustee distribute her assets in equal shares to her children.  Mrs. Gelber also executed a tangible personal property deed by which she conveyed all of her tangible personal property to herself as trustee.

On July 18, 2014, while Mrs. Gelber was an inpatient at St. Mary's Hospital in Richmond, she executed a deed of gift in which she conveyed her home on Edwardsville Drive in Glen Allen to Meryl, one of her five children.  On that same date, Mrs. Gelber executed a bill

2

of sale in which she conveyed to Meryl all items of her personal property located at her home.[2]

Mrs. Gelber, who was 87 years old at the time and suffering from terminal cancer, later made statements, both orally and by signed typewritten declaration, in which she disavowed the property transfers. More specifically, Mrs. Gelber stated that she did not intend to make the transfers, had no recollection of the execution of the documents, was in a weakened mental, physical, and emotional condition when she executed the documents, and did so upon undue influence and misrepresentations made to her by Meryl.

On August 19, 2014, Mrs. Gelber, individually, by and through her attorneys-in-fact, Larry and Darlene, filed a complaint against Meryl alleging undue influence and fraud in connection with Mrs. Gelber's execution of the deed of gift and bill of sale.[3] After Mrs. Gelber died on September 19, 2014, Larry and Darlene were substituted as plaintiffs in their capacities as executors of Mrs. Gelber's estate and trustees of her trust. Subsequently, the Executors added a count alleging a civil conspiracy between Meryl and her sister and brother-in-law, Linda and Philip Landa, though Meryl remained the sole defendant.

Meryl filed a counterclaim asserting breaches of contract, statutory warranty, and express warranty against the Executors and seeking damages and attorney's fees incurred in defending the claims made by Larry and Darlene in their capacities as trustees of Mrs. Gelber's trust.

Prior to trial, the Executors filed a motion for partial summary judgment as to title and possession of the personal property on the grounds that the bill of sale was signed by Mrs. Gelber in her individual capacity and was of no effect since the personal property had been conveyed in

---

[2] The deed of gift and bill of sale were both dated July 17.

[3] The complaint contained other counts that are not relevant to the appeal.

2010 to Mrs. Gelber in her capacity as trustee. Also prior to trial, Meryl filed a motion in limine seeking to exclude evidence of Mrs. Gelber's declarations not contemporaneous with the execution of the deed of gift and bill of sale to establish the substantive fact of undue influence. The circuit court denied both motions and the parties proceeded to trial.[4]

During trial, the circuit court excluded from evidence tax assessment records on Mrs. Gelber's home that the Executors sought to introduce to prove the home's value. After the Executors presented their evidence, the circuit court granted Meryl's motion to strike the Executors' evidence as to all claims. In granting the motion to strike, the circuit court ruled that declarations made by Mrs. Gelber disavowing the property transfers were not admissible and would not be considered in determining whether the Executors had met their burden of proof. At a separate hearing, the circuit court entered judgment for Meryl on her claim for attorney's fees.[5]

## II. DENIAL OF MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO PERSONAL PROPERTY

The Executors argue that the circuit court erred in denying their motion for partial summary judgment as to title and possession of Mrs. Gelber's personal property. They contend that the bill of sale failed to transfer title over the personal property, as a matter of law, because Mrs. Gelber signed the bill of sale in her individual capacity without referencing her capacity as trustee. We disagree with the Executors that they were entitled to partial summary judgment on this ground. Mrs. Gelber retained the power to revoke prior conveyances to her trust and was,

---

[4] The parties agreed that the issue of attorney's fees would be segregated from the jury trial and determined at a subsequent hearing.

[5] The parties entered into a stipulation that the circuit court's ruling on the motion to strike, if affirmed, would entitle Meryl to judgment on her counterclaim, with the only remaining issue being the determination of the amount of attorney's fees to be awarded to Meryl.

4

therefore, empowered to withdraw the property from the trust upon substantial compliance with the provisions of the trust agreement, which required only written notice to herself as trustee.

Mrs. Gelber was the sole settlor,[6] trustee, and lifetime beneficiary of her trust under the provisions of the 2010 trust agreement. Although Mrs. Gelber maintained the right to designate a successor trustee to serve upon her resignation, incapacity, or death, and named therein certain individuals to serve as trustees should she fail to designate a successor trustee, Mrs. Gelber remained the sole trustee at the time the bill of sale was executed by her. The trust agreement provided that "my Trustee shall distribute principal from the trust as I may direct." The trust agreement also expressly reserved to Mrs. Gelber "the right to revoke or amend this agreement by a writing (other than a will) signed by me and delivered to my Trustee during my lifetime." Therefore, as the settlor, trustee, and lifetime beneficiary, Mrs. Gelber maintained control over the property she placed in trust under the 2010 revocable trust agreement. *See Murnan v. Stewart Title Guar. Co.*, 585 F. Supp.2d 825, 834 (E.D. Va. 2008), *vacated in part on other grounds*, 607 F. Supp.2d 745 (E.D. Va. 2009) ("[A] grantor who retains the sole discretionary power to revoke the trust owns the right to eliminate the trust and thereby own the trust property outright any time she chooses to do so.").

Furthermore, Mrs. Gelber possessed the power to amend or revoke the trust upon substantial compliance with the provisions of the trust agreement. *See* Code § 64.2-751(C)(1) ("The settlor may revoke or amend a revocable trust . . . [b]y substantial compliance with a method provided in the terms of the trust."). *See also Austin v. City of Alexandria*, 265 Va. 89, 95, 574 S.E.2d 289, 292 (2003) (when a trust is revocable, the settlor retains the right to

---

[6] "Settlor" is defined as "a person . . . who creates, or contributes property to, a trust." Code § 64.2-701.

5

withdraw property from the trust in accordance with the terms specified by the trust agreement). The only requirement imposed upon Mrs. Gelber for exercising her rights under the 2010 trust agreement was "a writing . . . signed by me and delivered to my Trustee during my lifetime."

We have previously recognized that where the settlor of a revocable trust is also the trustee, a requirement of written notice to the trustee of the settlor's intention to revoke a prior conveyance may be satisfied by the settlor's written execution of instruments conveying the trust property to another party. *See id.* at 96, 574 S.E.2d at 293. In *Austin*, the settlor executed and recorded a deed in 1993 conveying real property to himself as trustee under a declaration of trust. The pertinent provisions of the declaration of trust named the settlor as the initial trustee, named the settlor as the income beneficiary during his lifetime, provided for discretionary distributions of corpus by the trustee to the settlor, and provided that "by signed instruments delivered to the Trustee," the settlor may withdraw property from the trust "upon giving reasonable notice in writing to the Trustee." *Id.* at 91-92, 574 S.E.2d at 290. In 1999, the settlor executed a deed in his individual capacity conveying the trust property to himself as trustee of a newly created trust.

The successor trustee of the 1993 trust challenged the 1999 deed as ineffective since the property previously had been conveyed by the settlor to himself as trustee of the 1993 trust. With regard to the settlor's compliance with the provisions of the 1993 trust, we reasoned that because the settlor was the trustee of the 1993 trust, written notice of the settlor to himself as trustee was a "non-issue." *Id.* at 96, 574 S.E.2d at 293. Therefore, we accepted the contention that the requirement of notice in writing to the trustee was satisfied by the settlor's "signed instruments" establishing the 1999 trust and conveying the property to the 1999 trust. *Id.*

Notwithstanding our holding in *Austin* that the written notice requirement of the 1993 trust was satisfied, we further concluded that the *settlor failed to comply with the revocation and*

*reversion of title provisions of the 1993 deed.* The deed provided that any revocation of the trust

agreement shall not be effective as to the property conveyed unless the grantor executed a deed,

duly recorded, evidencing the revocation and reversion of title. *See id.* at 96-97, 574 S.E.2d at

293. Because the 1999 deed was not executed by the grantor in his capacity as trustee and

contained no reference to the 1993 trust, we held that the 1999 deed *failed to satisfy the*

*revocation and reversion title requirements of the recorded 1993 deed. Id.* In contrast, the

tangible personal property deed executed by Mrs. Gelber in which she conveyed her personal

property to herself as trustee under the 2010 trust agreement contained no provisions requiring a

deed evidencing a revocation or reversion of title to the personal property.

In sum, Mrs. Gelber retained control over the property she conveyed to herself as trustee

under the terms of the 2010 trust agreement and reserved to herself the power to withdraw

property from her trust or revoke her prior conveyance of personal property to the trust upon

written notice to herself as trustee. We conclude that Mrs. Gelber's written execution of the bill

of sale substantially complied with the provision of the trust agreement requiring a writing

signed by her and delivered to herself.[7] Thus, we reject the Executors' contention that the bill of

---

[7] Although we conclude that Mrs. Gelber's written execution of the bill of sale
substantially complied with the provisions of the 2010 trust agreement requiring written notice to
her trustee of any revocation or amendment, we note that other courts have held, on various
grounds, that where the settlor of a revocable trust is also the trustee, strict compliance with a
requirement of written notice to the trustee is generally unnecessary. *See, e.g., Argo v. Moncus*,
721 So.2d 218, 222 (Ala. Civ. App. 1998) (where settlor of revocable trust was also the trustee,
"she -- acting as trustee -- could waive the requirement that as settlor she give written notice of
any changes to the trust. In other words, [the settlor] was not required to give *herself* written
notice that she was deeding her home to Argo") (emphasis in original); *Barnette v. McNulty*, 516
P.2d 583, 586 (Ariz. Ct. App. 1973) (noting that where settlor of revocable trust is also the
trustee, "[i]t would be absurd to require the settlor to call himself up on the telephone as trustee
and tell himself that he is revoking the trust. It would be equally absurd to have the settlor send
himself a letter as trustee to inform himself as trustee that the trust is to be terminated"); *Alerus
Fin., N.A. v. Western State Bank*, 750 N.W.2d 412, 423 (N.D. 2008) (noting that where settlor's

7

sale failed to transfer title over the personal property, as a matter of law, on the ground that Mrs. Gelber signed the bill of sale in her individual capacity.

## III. EXCLUSION OF DECLARATIONS BY MRS. GELBER

The Executors assign error to the circuit court's exclusion from evidence of declarations made by Mrs. Gelber disavowing the deed of gift and bill of sale. They argue that her declarations were admissible under the hearsay exception provided by Code § 8.01-397 (the "Dead Man's statute"). We review the circuit court's decision to admit or exclude evidence using an abuse of discretion standard. *John Crane, Inc. v. Jones*, 274 Va. 581, 590, 650 S.E.2d 851, 855 (2007). This review necessarily includes a determination of whether the circuit court was guided by an erroneous legal conclusion or flawed interpretation of Code § 8.01-397. *See Lawlor v. Commonwealth*, 285 Va. 187, 213, 738 S.E.2d 847, 861-62 (2013).

Although the circuit court initially denied Meryl's motion in limine to exclude declarations by Mrs. Gelber not made contemporaneously with the execution of the deed of gift and bill of sale and permitted most of Mrs. Gelber's statements into evidence, the circuit court subsequently ruled the statements were not admissible when it granted Meryl's motion to strike the Executors' evidence. The circuit court explained that "[t]he Dead[ M]an['s] [s]tatute is not available to the [Executors] as to hearsay exceptions for Ms. Gelber's declarations not contemporaneous with the execution of the deed of gift and the bill of sale," that "Virginia case law supports this," and that "[t]his would also perplex and mislead a jury." We conclude the

---

attorney-in-fact was also a trustee, requiring attorney-in-fact to give notice to himself as trustee of revocation of trust "would be an idle act"); *Paul v. Arvidson*, 123 P.3d 808, 810 (Okla. Civ. App. 2005) (noting that "when the grantor and the trustee are the same person, requiring strict compliance with formal delivery of written notice would be unnecessary and absurd"); *Moon v. Lesikar*, 230 S.W.3d 800, 806 (Tex. Ct. App. 2007) (noting that "[w]hen the trustee is also the settlor of the revocable trust, the settlor is not required to serve written notice on himself").

circuit court erred in its ruling on the admissibility of Mrs. Gelber's declarations under the Dead Man's statute.

Code § 8.01-397 states, in pertinent part:

> In an action by or against a person who, from any cause, is incapable of testifying, or by or against the committee, trustee, executor, administrator, heir, or other representative of the person so incapable of testifying . . . whether such adverse party testifies or not, *all entries, memoranda, and declarations by the party so incapable of testifying made while he was capable, relevant to the matter in issue, may be received as evidence in all proceedings* including without limitation those to which a person under a disability is a party.

(Emphasis added.) Under the plain language of the statute, "all entries, memoranda, and declarations" by Mrs. Gelber prior to her death are admissible to the extent they are "relevant to the matter in issue." *Id. See also* Va. R. Evid. 2:804 (b)(5) (providing hearsay exception for statements by party incapable of testifying and incorporating language of Code § 8.01-397); Charles E. Friend & Kent Sinclair, The Law of Evidence in Virginia § 10-7[f], at 575-76 (7th ed. 2012) (noting that Code § 8.01-397 provides that "in any case by or against a decedent/incapacitated person, the hearsay out-of-court statements of the decedent/incapacitated person are generally admissible"). Contrary to the circuit court's ruling, therefore, the hearsay exception set forth in Code § 8.01-397 contains no language that would limit its application to Mrs. Gelber's declarations that were contemporaneous with her execution of the deed of gift and bill of sale.

To the extent that the circuit court relied upon our decision in *Wallen v. Wallen*, 107 Va. 131, 57 S.E. 596 (1907), its reliance was misplaced. In *Wallen*, we held that "declarations of the testator, not made contemporaneously with the execution of his will, are relevant evidence, to show his feelings and affections towards the natural objects of his bounty, his mental condition as reflecting upon his testamentary capacity, but are not admissible to establish the substantive

9

fact of undue influence." *Id.* at 157, 57 S.E. at 601. We reasoned that such declarations were hearsay and could only be admitted if made contemporaneously with the execution of the will as part of the "res gestae" to show the state of mind of the testator. *Id.* at 152-57, 57 S.E. at 600-01 ("The declarations are purely hearsay, being merely unsworn declarations, and, when no part of the *res gestae*, are not within any of the recognized exceptions, admitting evidence of that kind.") (quoting *Throckmorton v. Holt*, 180 U.S. 552, 573 (1901)).[8] Our decision was rendered when the Dead Man's statute precluded the surviving party from testifying (with certain exceptions) when the opposing party was incapable of testifying. At that time, the Dead Man's statute contained no hearsay exception for declarations made by the party incapable of testifying. *See* Pollard's Code § 3346 (1904).

In 1919, Code § 3346 was repealed and replaced by Code § 6209 (the predecessor to Code § 8.01-397), which allowed the admission of testimony of the surviving party and the admission of the declarations of the party incapable of testifying. The goal of the plenary revisions of the Code with respect to competency issues in 1919, including the Dead Man's

---

[8] The "res gestae rule," applied in *Wallen*, referred to a doctrine allowing the admission of out of court statements accompanying a fact in issue. "To come within the terms and operation of the rule, the declarations must accompany and explain an act done, which is a fact in issue or is relevant to the issue." *Scott v. Shelor*, 69 Va. (28 Gratt.) 891, 896 (1877). "Although it is often erroneously believed that this term describes a single exception to the hearsay rule, the term was prominent in the Nineteenth Century as a grab-bag concept covering a variety of situations with the common denominator that they involve words (or, rarely, acts or omissions) accompanying an incident and serve to explain that incident." Friend & Sinclair, *supra*, § 15-17, at 991. "The term 'res gestae' has not been used as a specific hearsay exception in Virginia for decades. The last direct discussion of the doctrine was in 1990 by the Court of Appeals, which recognized that -- in modern times -- the more specific doctrines of 'excited utterances' and 'present sense impressions' have replaced the more general older concept." *Id.* (citing *Jones v. Commonwealth*, 11 Va. App. 75, 83-84, 396 S.E.2d 844, 848-49 (1990)). *See also* Friend & Sinclair, *supra*, § 15-16, at 989 (Declarations of testators are often admitted under any one of the several subdivisions of the "state-of-mind" exception to prove testamentary intent and matters bearing upon questions of intent.).

statute, was to "remove 'practically all disqualifications,' and thus permit the courts to hear 'all evidence bearing on the question at issue' just as usual 'in the business affairs of life.'"  Friend & Sinclair, *supra*, § 10-7[a], at 568 (quoting *Epes v. Hardaway*, 135 Va. 80, 88, 115 S.E. 712, 715 (1923)); *see also Arwood v. Hill*, 135 Va. 235, 241, 117 S.E. 603, 605 (1923) (explaining that the amendment to the Dead Man's statute "was intended to remove all disqualifications affecting the competency of witnesses in suits by or against the estates of persons laboring under disability or who are from any cause incapable of testifying").[9]  Therefore, our holding in *Wallen*, which was rendered before the Dead Man's statute contained a hearsay exception for declarations of a party incapable of testifying, cannot be relied upon to exclude declarations by Mrs. Gelber that clearly fall within the hearsay exception set forth in Code § 8.01-397.[10]

Because Mrs. Gelber's declarations, "relevant to the matter in issue," were admissible under the hearsay exception provided for by Code § 8.01-397, the circuit court abused its discretion in ruling that Ms. Gelber's declarations not contemporaneous with the execution of the deed of gift and the bill of sale were inadmissible.[11]

---

[9] When Code § 6209 was enacted in 1919, it only permitted admission of declarations by the party incapable of testifying if the surviving party testified.  *See* Code § 6209 (1919).  In 1977, the language of the Dead Man's statute requiring that the surviving party testify was eliminated.  *See* 1977 Acts ch. 617 (repealing former Code § 8-286 and enacting Code § 8.01-397).

[10] Although we applied the holding in *Wallen* in decisions rendered after the enactment of Code § 6209, *see e.g.*, *Core v. Core*, 139 Va. 1, 7, 124 S.E. 453, 454 (1924) and *Savage v. Nute*, 180 Va. 394, 402, 23 S.E.2d 133, 137 (1942), these decisions did not address the Dead Man's statute or its effect on our holding in *Wallen*.

[11] Meryl does not contest the relevancy of Mrs. Gelber's declarations disavowing the deed of gift and bill of sale.  Rather, she contends the exclusion of such declarations is required by our holding in *Wallen*.

## IV. EXCLUSION OF REAL ESTATE TAX ASSESSMENTS

The Executors argue that the circuit court erred in refusing to admit records of the real estate tax assessments on Mrs. Gelber's home. The circuit court sustained Meryl's objection to the admission of the records on the ground that the records constituted inadmissible hearsay. The Executors contend that the records were admissible under the public records hearsay exception. As stated previously, we review the circuit court's decision to exclude the tax assessment records under an abuse of discretion standard. *See John Crane, Inc.*, 274 Va. at 590, 650 S.E.2d at 855.

During Larry's testimony at trial, the Executors sought to introduce a record of the 2015 real estate tax assessment on Mrs. Gelber's home as well as a record of assessment information for prior tax years dating back to 2006. The documents, certified as records of the Real Estate Assessment Division of the Henrico County Finance Department, contained the County's assessed value of Mrs. Gelber's home in 2015 and the assessed values in prior years. The purpose for which the Executors sought to introduce the tax assessment records was to establish the value of Mrs. Gelber's home.

Because the information contained within the tax assessment records was offered by the Executors to establish the truth of the matters asserted therein, i.e., the value of Mrs. Gelber's home, the proffered exhibits were hearsay. *See* Va. R. Evid. 2:801(c) (defining "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"); *Arnold v. Wallace*, 283 Va. 709, 713, 725 S.E.2d 539, 541 (2012) ("A hearsay objection lies against the admission of written statements which were made out of court and are offered for the truth of what they say."). Therefore, the tax assessment records were not admissible unless they fell within a recognized exception to the

12

hearsay rule. *See* Va. R. Evid. 2:802 (stating that "[h]earsay is not admissible except as provided by these Rules, other Rules of the Supreme Court of Virginia, or by Virginia statutes or case law").

The Executors rely on Rule 2:803(8), which provides a hearsay exception for "records, reports, statements, or data compilations, in any form, prepared by public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed within the scope of the office or agency's duties, as to which the source of the recorded information could testify if called as a witness." The Executors argue that Meryl did not contest the authenticity of the tax assessment records, which were prepared by a public official and set forth matters observed within the scope of the official's duties.

While it is true that Rule 2:803(8) provides a hearsay exception for public records, the Rule does not render *opinions* contained within the hearsay automatically admissible. *See* Friend & Sinclair, *supra*, § 15-1[d], at 905 ("The objection that an item of proffered proof is hearsay is but one of the many grounds on which the proof might be excluded. Conversely, *satisfying* the hearsay rule by identifying . . . a recognized 'hearsay exception' which allows the proof to be received despite the general hearsay ban . . . solve[s] *only* the hearsay problem.") (emphasis in original). "The traditional rule has been that the opinion rule applies to hearsay declarations to the same extent that it applies to in-court testimony. Thus, a hearsay declaration containing a statement of opinion must, to be admissible, satisfy the requirements of both the rule prohibiting admission of hearsay and the rules restricting the expression of opinion by witnesses." *Id.* In particular, we have held that the official documents exception to the hearsay rule does not "permit the introduction of opinion evidence contained in any such records." *Smith v. Woodlawn Construction Co.*, 235 Va. 424, 432, 368 S.E.2d 699, 704 (1988)

13

(holding that record of assessed value of the property by local commissioner of revenue was properly excluded).

The tax assessment records on Mrs. Gelber's property contained the expert opinion of the public official as to the value of Mrs. Gelber's home. Admission of the tax assessment records would have allowed the Executors to introduce expert opinion as to the value of Mrs. Gelber's home without requiring them to qualify an expert or satisfy the foundational requirements for admission of expert testimony. "The admission of hearsay expert opinion without the testing safeguard of cross-examination is fraught with overwhelming unfairness to the opposing party. No litigant in our judicial system is required to contend with the opinions of absent 'experts' whose qualifications have not been established to the satisfaction of the court, whose demeanor cannot be observed by the trier of fact, and whose pronouncements are immune from cross-examination." *McMunn v. Tatum*, 237 Va. 558, 566, 379 S.E.2d 908, 912 (1989); *see also Harman v. Honeywell Int'l, Inc.*, 288 Va. 84, 93 n.4, 758 S.E.2d 515, 520 n.4 (2014) ("This Court has long recognized the dangers of admitting hearsay expert opinion.").

Accordingly, because the tax assessment records contained hearsay expert opinion, we conclude that the circuit court did not abuse its discretion in excluding them from the evidence at trial.

## V. RULINGS ON MOTION TO STRIKE

The Executors assert that the circuit court erred in granting Meryl's motion to strike the evidence as to their claims of undue influence, fraud, and civil conspiracy. When ruling on a motion to strike the plaintiff's evidence, the circuit court must "accept as true all the evidence favorable to the plaintiff as well as any reasonable inference a jury might draw therefrom which would sustain the plaintiff's cause of action." *Austin v. Shoney's, Inc.*, 254 Va. 134, 138, 486

14

S.E.2d 285, 287 (1997). The circuit court may not "judge the weight and credibility of the evidence, and may not reject any inference from the evidence favorable to the plaintiff unless it would defy logic and common sense." *Id.* When reviewing a circuit court's decision granting a motion to strike the plaintiff's evidence, we likewise review the evidence in the light most favorable to the plaintiff. *Egan v. Butler*, 290 Va. 62, 73, 772 S.E.2d 765, 772 (2015).

A. Evidence Presented at Trial

Mrs. Gelber and her husband, Melvin Gelber, lived in New Jersey their entire married lives and had five children: Linda, who still resides in New Jersey; Meryl, who now resides in Richmond; Larry, who also resides in Richmond; Darlene, who now resides in Baltimore; and Douglas Gelber, who still resides in New Jersey. When Melvin died in 1995, Mrs. Gelber began looking to relocate, and in 2008, purchased a home in a senior community on Edwardsville Drive in Glen Allen.

After Mrs. Gelber moved to the Richmond area, she developed a very close relationship with Meryl, whose light work schedule allowed Meryl to spend time with Mrs. Gelber. Mrs. Gelber began giving Meryl $500 or more a month because Meryl often purchased groceries, clothing, and personal products for Mrs. Gelber and provided Mrs. Gelber with transportation. Meryl regularly took Mrs. Gelber to her medical and other appointments. Mrs. Gelber "trusted Meryl a lot" and added Meryl as a joint owner of Mrs. Gelber's checking account. Meryl began paying Mrs. Gelber's bills from the jointly-owned checking account and reconciled Mrs. Gelber's checkbook to the monthly bank statement.

Mrs. Gelber was described as "stoic, independent, detailed oriented, [and] meticulous about things." In legal, financial, and estate planning matters, Mrs. Gelber maintained relationships with her own lawyer, accountant and financial advisor and also sought input from

15

her children. Mrs. Gelber "liked getting feedback" but was "very opinionated on how she ultimately determined what direction to go" and "made independent decisions." With specific regard to Mrs. Gelber's estate plan, "[a]ll five children knew that [Mrs. Gelber] always wanted things the way that she and her brothers had things with their parents, everything divided equally."

In 2009, Mrs. Gelber engaged a Richmond attorney to assist her with an estate plan but became dissatisfied with the legal documents that had been drafted. Unable to resolve the issues with the 2009 documents, Mrs. Gelber hired attorney Tim Guare in Richmond to draft a new set of estate planning documents. When Mrs. Gelber met with Guare in May or June of 2010, her children were present with the exception of Linda. Mrs. Gelber told Guare that she wished to divide her estate equally among her five children. Mrs. Gelber asked Darlene and Linda, both of whom are attorneys, to read everything to "make sure [the documents] reflected [Mrs. Gelber's] exact wishes." After several months of "red lining, revisions, emails, [and] phone calls," Mrs. Gelber's estate planning documents were finalized and executed on December 1, 2010.[12]

Mrs. Gelber was diagnosed with colon cancer in 2013 and underwent surgery. In 2014, Mrs. Gelber's condition became progressively worse and it was discovered that the cancer had spread to her lungs, liver, lymph nodes, and abdomen. Mrs. Gelber was told by her oncologist that without treatment she had only two months to live. Mrs. Gelber began chemotherapy

---

[12] Mrs. Gelber told her accountant in 2013 that she might make a gift to Meryl "because Meryl had been so kind to her and thoughtful and worked so hard to keep her mobile when she could no longer get around on her own." Mrs. Gelber expressed, however, that favoring Meryl might cause difficulty for Meryl due to the contentious relationship among her children. Mrs. Gelber later told her sister-in-law in 2014 that she might "skip generations" and "give [her] money to the grandchildren" since all her children had advanced degrees and could support themselves. However, Mrs. Gelber made no changes to her estate plan prior to the July 18 transactions.

treatment and various family members stayed with Mrs. Gelber in shifts to ensure she was not alone.

Darlene's daughters, Laura and Melissa, both of whom lived in Baltimore, regularly visited Mrs. Gelber to care for her and, when visiting, stayed at Mrs. Gelber's home for several days at a time. Because Laura was in nursing school, Mrs. Gelber wanted Laura to be involved in her care. Laura described an occasion on which she was staying with Mrs. Gelber when she was scheduled to see a new oncologist. Meryl agreed to drive them both to the appointment but was late arriving. When Mrs. Gelber expressed her concern about being late for the appointment, Meryl "lectured" Mrs. Gelber and "shut her down" causing Mrs. Gelber to become "completely silent." When they completed paperwork at the doctor's office, Mrs. Gelber identified four persons she wanted to list as being authorized to have access to her medical information. Mrs. Gelber specifically included Laura since she would be spending time with her in the summer. After the appointment, Meryl told Laura it would be better if less people had access to Mrs. Gelber's medical information. Meryl obtained the completed paperwork from the front office, "asked for a new sheet," then "threw away the old sheet of what Grandma had wanted."

After Mrs. Gelber began her chemotherapy treatment, she became increasingly weak, suffering at least three falls, and was admitted to St. Mary's Hospital on July 3, where she was hospitalized until July 21. According to medical records, Mrs. Gelber remained physically weak, suffered from continuous bouts of diarrhea, and was frequently forgetful, confused and disoriented throughout her hospitalization. Although plans were made for Mrs. Gelber's transfer to Beth Sholom within a few days after her admission to St. Mary's, her discharge from St. Mary's was cancelled several times due to Mrs. Gelber's poor physical condition.

17

After Mrs. Gelber became ill, she told Darlene that "[i]t would be a lot easier if I move into an addition that Meryl and I are talking about," but added that "she would prefer a little cottage" so that "she would have her privacy on Meryl's property." Mrs. Gelber also told Larry that she and Meryl discussed building an addition on Meryl's home where Mrs. Gelber could live.

In a July 17 text message Larry sent to Darlene while at his mother's bedside at St. Mary's, Larry reported that Mrs. Gelber was sleeping and had experienced numerous episodes of diarrhea that day, though Mrs. Gelber told her doctor she had none. When Darlene responded that Mrs. Gelber's condition was "going from bad to worse," Larry told Darlene that he "just hoped they could get her out of here" but "fear[ed] she would end up in assisted living." Larry also stated that "[s]he won't end up in an addition to Meryl's home" and "is going to need 24-hour supervision." On July 18, 2014, at 5:32 p.m., Larry sent a text message to Darlene from the hospital reporting that the nurse was bringing medication for Mrs. Gelber's diarrhea. At that time, Mrs. Gelber was "so weak that she was difficult to arouse." When Larry attempted to wake Mrs. Gelber, she thought he was his brother, Doug.

During Mrs. Gelber's hospitalization, Linda's husband, Philip, began contacting attorneys in Richmond to assist in arranging a conveyance of Mrs. Gelber's home and personal property to Meryl. On July 10, Philip phoned Gregory D. Foreman, an attorney with Bowen, Champlin, Foreman, and Rockecharlie. Philip told Foreman that he "was trying to help his sister-in-law Meryl Glock make arrangements for her mother, the grantor, to make a gift to [Meryl] of the mother's home." Philip also told Foreman that Mrs. Gelber intended to give her home in Henrico County as well as all personal property in the home to Meryl and that three other siblings would receive Mrs. Gelber's lake house in New York. On July 14, Linda called

18

and left a message for Foreman, and on that same date, Meryl called Foreman to provide the street address for the property. According to Foreman, "[Meryl], like [Philip], gave Mr. Foreman the impression that she wished to complete the real estate and personal transactions in a hurry." Because "[t]he urgency with which [Meryl] and [Philip] spoke caused Mr. Foreman some apprehension or 'bad feeling,'" he told Meryl "he could not accept this matter for representation."

Philip phoned Thomas F. Eubank, an attorney with Spinella, Owings, and Shaia PC, on July 16, 2014, asking him to prepare a deed conveying property from Mrs. Gelber to Meryl. Because Eubank was planning to be out of town, one of his associates, Justin Rittner, was assigned to prepare the deed. Rittner stated that he did not conduct a title search and that the land records were already in the file when he received the assignment. Although Philip's contact information was contained within the file, Rittner could not recall whether he spoke with Philip. Neither Eubank nor Rittner were told of the family dynamics surrounding the transaction or of any prior estate planning by Mrs. Gelber. Rittner did not recall reviewing the documents with Meryl. After Rittner prepared the deed of gift and bill of sale, Meryl retrieved the documents from Rittner's office.

On July 18th, Mrs. Gelber was scheduled to be discharged and transferred to Beth Sholom. Meryl went to St. Mary's after she obtained the documents from Rittner's office and informed the patient advocate that she needed to have Mrs. Gelber's signature on legal documents notarized.[13] According to Meryl, Linda and Philip happened to call on Meryl's cell phone so she "put them on speakerphone" after the patient advocate arrived and placed her

---

[13] The Executors introduced into evidence excerpts of Meryl's deposition testimony.

phone on Mrs. Gelber's bed. The patient advocate chatted for a few minutes with Mrs. Gelber regarding her discharge scheduled for that day, then asked for the legal documents, placed them in front of Mrs. Gelber, and indicated to her where she should sign. Meryl asked Mrs. Gelber if she was "sure she still want[ed] to do this," and Mrs. Gelber replied, "Just give me the pen." Meryl returned the executed documents to Rittner's office for recording, which was completed on July 24. Although Mrs. Gelber was billed as the client, Meryl paid Rittner's fees by personal check and was provided with a hard copy of the file. Meryl, Linda, and Philip told no other family members of the July 18 transactions.

Dennis M. O'Neill, a physician who specializes in internal medicine and geriatrics, employed as a full-time hospitalist and nursing home medical director, provided expert testimony regarding Mrs. Gelber's physical and mental condition during her hospitalization at St. Mary's. Dr. O'Neill testified that based on his review of medical records, depositions, and other discovery responses, he concluded that Mrs. Gelber was in a "state of delirium" during her entire hospitalization, including on July 18, the date she signed the deed of gift and bill of sale. He explained that Mrs. Gelber was suffering from the effects not only of her "terminal stage 4-B colon cancer with multiple metastasis," but also from adverse effects of chemotherapy manifested by severe diarrhea, dehydration, protein malnutrition, decreased cognitive function, and periods of disorientation and confusion. According to Dr. O'Neill, although Mrs. Gelber's cognitive functioning was at different levels during her hospital stay,[14] Mrs. Gelber's cognitive impairment "was there every day" during the "time frame from the 15th to the 20th [of July]."

---

[14] Dr. O'Neill admitted that the medical records contained notations that Mrs. Gelber was appropriately alert and oriented at times during her hospitalization.

20

Mrs. Gelber was discharged from St. Mary's and admitted to Beth Sholom on July 21. Upon Mrs. Gelber's discharge, Meryl took possession of Mrs. Gelber's personal belongings, including her pocketbook. At Beth Sholom, when Laura went to the nurse's station to get an update on Mrs. Gelber's medications and status, she was informed that she was not authorized to receive the information. When Laura asked Meryl why it was a problem for her to have access to Mrs. Gelber's medical information, Meryl told her Mrs. Gelber no longer needed her now that she was out of the hospital. Larry learned that the admission record identified Meryl as Mrs. Gelber's sole contact and as holding Mrs. Gelber's power of attorney for health care and financial decisions. At that time, Larry and Linda held power of attorney for financial decisions, and at Mrs. Gelber's request, the form was changed to that effect and to add Larry as a family contact.

Dierdre Arnowitz, Director of Resident Services at Beth Sholom Life Care Community, was present at Beth Sholom when Mrs. Gelber was admitted on July 21, 2014. On that date, Mrs. Gelber expressed hope that she would get better and benefit from physical therapy to return home upon her discharge. Mrs. Gelber also told Arnowitz that "she loved her home and everything in her home." Mrs. Gelber "would reminisce a lot with [Arnowitz] about all of her memorabilia that's in her home" and "she hoped to return there." When discussing Mrs. Gelber's options upon discharge, Mrs. Gelber told Arnowitz that she and Meryl had discussed building an addition to Meryl's home for Mrs. Gelber. According to Arnowitz, Meryl told Mrs. Gelber that she didn't need further treatments and Mrs. Gelber understood that to mean that she would be getting better.

Because Arnowitz was concerned that Mrs. Gelber did not understand the terminal nature of her illness, she made arrangements for Mrs. Gelber's treating physician, Jennifer Ferguson, to

21

visit Mrs. Gelber.  When Dr. Ferguson saw Mrs. Gelber on July 22, Mrs. Gelber had lost weight, muscle mass, and protein.  Mrs. Gelber was nervous and unclear on how serious her condition was.  She had difficulty focusing and staying on task and was very sleepy.  She also had difficulty recalling short-term activities.  Dr. Ferguson testified that it was clear from the time that Mrs. Gelber was at St. Mary's that she would require full-time nursing care upon her discharge from the hospital.

On July 24, Darlene found that Mrs. Gelber's home "was out of order" and "disheveled." According to Darlene, drawers in Mrs. Gelber's bedroom were left "open," keys to a set of ivory cabinets and a storage room key were missing, and it appeared that her things had been "rifled through" and "were not right."  Darlene phoned Meryl, who did not answer, and then phoned Larry and asked him to come to Mrs. Gelber's home.  When Darlene used Larry's key to unlock the storage room, she discovered that Mrs. Gelber's box of jewelry was missing.  Darlene spoke to a neighbor who told Darlene that "there had been problems in the neighborhood" and although Darlene saw no signs of a break-in, Darlene and Mrs. Gelber agreed that Darlene would take some of Mrs. Gelber's "favorite items" to Larry's home for safekeeping.  Darlene "took a dozen or so items" to Larry's home and created an inventory of the items, which she reviewed with Mrs. Gelber on the evening of July 24.  Included in these items was Mrs. Gelber's engagement ring, which Darlene brought to Mrs. Gelber and placed on her finger.

On July 29, 2014, Laura and Melissa took a train to Richmond after learning that Mrs. Gelber had fallen at Beth Sholom.  When they arrived at Mrs. Gelber's home, Meryl was there with a "security van."  Meryl told them they "had to leave and that we better not let that cab pull away."  Laura and Melissa were confused and told Meryl they wanted to go to Beth Sholom to check on Mrs. Gelber.  Meryl informed them that Mrs. Gelber did not want them on the property

22

and that if they did not leave, she would call the police. After the police arrived, Meryl revealed that she now owned Mrs. Gelber's home and wanted Laura and Melissa to leave. When Laura and Melissa went to Beth Sholom and spoke with Mrs. Gelber, she denied transferring ownership of her property to Meryl though Mrs. Gelber informed them that Philip had accused Darlene of stealing everything from the house.

When Darlene told her mother that Meryl had documents showing that she owned Mrs. Gelber's home and asked Mrs. Gelber if she signed anything while she was in the hospital, Mrs. Gelber described herself as being in a "coma" during that time. Mrs. Gelber stated, "I didn't know who I saw in the hospital and I certainly wouldn't have signed anything in the hospital." Mrs. Gelber insisted that it was a "terrible misunderstanding" and told Darlene that they "had to give [Meryl] the benefit of the doubt" and "she, Mom, would clear it up."

Mrs. Gelber tried multiple times, without success, to reach Meryl by phone. Various family members testified that they left messages for Meryl asking for Mrs. Gelber's personal items, such as eyeglasses, walker, toiletries, and clothing that Mrs. Gelber needed at Beth Sholom, but Meryl never returned those calls or brought those items to Mrs. Gelber. Larry described a confrontation with Meryl at Beth Sholom, which ultimately led to the involvement of police. Mrs. Gelber told Larry that she did not "know how she could have let herself be controlled" by Meryl and "was devastated at what happened, that her other children and grandchildren would never see her personal possessions again and that she would never enjoy them again."

Mrs. Gelber told Arnowitz on numerous occasions that she was extremely upset by the situation, felt exploited by Meryl, and had tried many times to reach Meryl to obtain certain things from her home. Mrs. Gelber told Arnowitz she intended that her home and personal

23

property would be under her control until she died and she wished for her home and personal property to be returned to her. Arnowitz testified that although she also called Meryl and left messages asking for Mrs. Gelber's pajamas, pocketbook, and wallet, Meryl only brought the pajamas. As a mandated reporter, Arnowitz contacted Adult Protective Services and the Ombudsman.

On July 31, Dr. Ferguson explained to Mrs. Gelber that there would be no further chemotherapy and that her treatment would consist only of palliative and hospice care. Mrs. Gelber was surprised there would be no further treatment but she ultimately accepted her prognosis. Dr. Ferguson was aware of the tension among family members over Mrs. Gelber's property and left a message with Meryl but was never able to speak with her.

On August 1, 2014, Mrs. Gelber executed a durable power of attorney in which she appointed Larry and Darlene as her attorneys-in-fact. She also engaged a law firm to assist her in obtaining the return of her home and personal property.[15] On subsequent dates, Mrs. Gelber amended her trust to appoint Larry, Doug, and Darlene as her successor trustees, to substitute Meryl's daughter as the beneficiary of Meryl's share of her estate, and to substitute three designated charities as the beneficiaries of Linda's share of her estate.

On August 4, legal counsel for Mrs. Gelber sent a letter to Meryl asking for the return of numerous items of personal property and money that Meryl had taken. Included in this request were Mrs. Gelber's checkbook; Mrs. Gelber's pocketbook, which contained her wallet, identification, Medicare cards, credit cards, address book, and other financial, health, and personal information "to which she needs immediate access;" and, $7,500 that Meryl withdrew

---

[15] Larry and Darlene, who held Mrs. Gelber's power of attorney, were also signatories to the client engagement agreement.

from Mrs. Gelber's checking account. Mrs. Gelber's counsel requested that Meryl invalidate the deed of gift and return property taken from Mrs. Gelber's residence. On August 8, Meryl's legal counsel arranged for the delivery of certain items including Mrs. Gelber's wallet, checkbook, bills received at Mrs. Gelber's home, and the $7,500 cash withdrawn from the account.

On August 8, 2014, Mrs. Gelber signed a type-written declaration stating as follows:

> I did not intend to sign the deed that conveyed my home on Edwardsville Drive to my daughter, Meryl Glock. When she asked me to sign the deed, I was in a weakened mental, physical, and emotional state. I believe she took advantage of my condition to take my home.
>
> Meryl led me to believe that I did not need any more chemotherapy for my cancer. She said that I could then move into an addition that she was going to build at her home. I now know that my cancer is not in remission. It will never be possible for me to move into Meryl's home. I now believe that I was tricked by Meryl into giving her my home. Meryl said she needed my home so she could sell it. She said she would use the money to build the addition on her home.
>
> I do not remember signing my personal possessions over to Meryl. I do not believe that I would have done that unless I was manipulated by Meryl. I had intended to give specific pieces of property to all my children and not all to one child. I have told that to my children many times.
>
> I am very angry and upset with my daughter, Meryl, who I believe has manipulated me and betrayed my trust. I think she has essentially stolen my property – including my home and personal possessions – from me. She is keeping from me many of the things that are meaningful to me in my life. I don't know why she would do those things to me at this point in my life after all the generosity I have shown her.
>
> I declare under penalty of perjury that the foregoing is true and correct.

Mrs. Gelber left Beth Sholom on August 11 and moved into Sunrise of Pikesville, an assisted-living facility near Baltimore. Mrs. Gelber wanted certain items for her apartment at Sunrise, such as her bed pillow, slippers, dresser, table, and family photographs, but was never able to obtain these items from Meryl. Mrs. Gelber told Darlene and Larry she did not wish to see Meryl or Linda again

25

Meryl denied that she ever discussed with Mrs. Gelber the building of an addition to Meryl's home or selling Mrs. Gelber's home to fund such an addition. Meryl testified that Mrs. Gelber told her on several occasions beginning in the spring of 2014 that she wanted Meryl to have her house. Although Meryl initially refused because she believed it would upset Larry and Darlene, she eventually accepted Mrs. Gelber's offer of the property. Meryl stated she did not have any discussions with Mrs. Gelber about the logistics of how the transfer of property would take place or any discussions with Mrs. Gelber's lawyer or accountant regarding the effect, if any, that the transfers would have on Mrs. Gelber's estate plan or taxes. Meryl testified that Mrs. Gelber expressed her wishes to Linda and Philip that the home be transferred to Meryl and told them to "get it done."

Meryl testified she withdrew $7,500 from Mrs. Gelber's checking account because she wanted to pay Mrs. Gelber's bills. Her plan was to pay the bills with her own personal checks and deposit a corresponding amount of cash in her own account. Meryl assumed that Mrs. Gelber would continue to pay the bills associated with her home.

Meryl admitted she never told her husband about the discussions she had with Mrs. Gelber about Mrs. Gelber's intention to give Meryl her home or about the July 18 transactions because Mrs. Gelber told Meryl not to tell anyone until after she died. Meryl testified that she believed Darlene removed a silver tea set from Mrs. Gelber's home without permission and spoke with Linda and Philip about having the locks changed. Meryl didn't tell her husband about the property transfers until July 29 when she arranged to have the locks to Mrs. Gelber's home changed.

B. Undue Influence

The issue of whether the Executors introduced sufficient evidence to establish, as a matter of law, a prima facie case of undue influence against Meryl is reviewed de novo. *Parfitt v. Parfitt*, 277 Va. 333, 339, 672 S.E.2d 827, 829 (2009). Viewing the evidence in the light most favorable to the Executors, *see Egan*, 290 Va. at 73, 772 S.E.2d at 772, we conclude that the Executors presented sufficient evidence to support a claim of undue influence against Meryl.

"To set aside a deed or contract on the basis of undue influence requires a showing that the free agency of the contracting party has been destroyed." *Friendly Ice Cream Corp. v. Beckner*, 268 Va. 23, 31, 597 S.E.2d 34, 38 (2004). "Because undue influence is a species of fraud, the person seeking to set aside the [deed or] contract must prove undue influence by clear and convincing evidence." *Id.*

We have previously identified two situations in which a party may show undue influence. First, a party may establish a prima facie case of undue influence upon proof of great weakness of mind and grossly inadequate consideration or suspicious circumstances. Second, a party may establish a prima facie case of undue influence upon proof that a confidential relationship existed between the grantor and proponent of the instrument. *Id.* at 31-32, 597 S.E.2d at 38-39. Therefore, "the presumption of undue influence arises and the burden of going forward with the evidence shifts when weakness of mind *and* grossly inadequate consideration or suspicious circumstances are shown *or* when a confidential relationship is established." *Id.* at 33, 597 S.E.2d at 39 (emphasis in original); *see also Ayers v. Shaffer*, 286 Va. 212, 224, 748 S.E.2d 83, 90 (2013); *Parfitt*, 277 Va. at 339-42, 672 S.E.2d at 829-30. "These principles apply to gratuitous transfers as well as contracts." *Parfitt*, 277 Va. at 340, 672 S.E.2d at 829.

i.      Weakness of Mind and Grossly Inadequate Consideration or Suspicious Circumstances

The Executors presented sufficient evidence to prove that Mrs. Gelber suffered from great weakness of mind when she executed the deed of gift and bill of sale.  Dr. O'Neill, who reviewed the Mrs. Gelber's medical records from St. Mary's, concluded that Mrs. Gelber was in a state of delirium and cognitively impaired during her entire hospitalization, including on July 18, the date the deed of gift and bill of sale were executed by her.  The medical records confirm that Mrs. Gelber was in a severely weakened physical and mental condition and experienced periods of disorientation and confusion while she was at St. Mary's.  Larry, who visited Mrs. Gelber daily while she was at St. Mary's, testified that on July 18, he found her so weak she was difficult to arouse, and when he did so, she confused Larry for his brother.  In addition to this evidence, Mrs. Gelber signed a written declaration stating that when the documents were executed, she was in a weakened mental, physical, and emotional state and had no actual recollection of signing the documents.  Furthermore, Mrs. Gelber described herself as feeling as though she was in a "coma" during her hospitalization.

Meryl argues that the Executors presented evidence that Mrs. Gelber lacked the capacity to execute a legal document and was, therefore, not subject to undue influence.  Relying on *Massie v. Firmstone*, 134 Va. 450, 114 S.E. 652 (1922), Meryl contends that the Executors were bound by this evidence, which negated their claims of undue influence and fraud.  In *Massie*, we stated that a litigant's "statements of fact and the necessary inferences therefrom are binding upon him." *Id.* at 462, 114 S.E. at 656.  This principle has no application to the opinions expressed by the parties and witnesses as to Mrs. Gelber's mental capacity. *See, e.g., Braden v. Isabell K. Horsley Real Estate, Ltd.*, 245 Va. 11, 16, 425 S.E.2d 481, 484 (1993) (explaining that the *Massie* doctrine does not apply to statements of opinion).  The extent of Mrs. Gelber's

capacity and whether she was mentally capable of being unduly influenced by Meryl to execute the documents presented issues for resolution by the jury.

With regard to the evidence of inadequacy of consideration, the deed of gift recites no consideration and the bill of sale recites a consideration of $1. A reasonable juror could conclude that consideration of $1 for Mrs. Gelber's home and all personal property located at the home is grossly inadequate. Although we held in *Henderson v. Henderson*, 255 Va. 122, 495 S.E.2d 496 (1998), that a claim of undue influence based on inadequacy of consideration was inapplicable to a deed of gift, the grantor in that case testified that he agreed to sign the deed of gift under the impression that there would be no tax consequences from the gift, but later realized he had made a mistake. *Id.* at 124-25, 495 S.E.2d at 497-98. In contrast, Mrs. Gelber stated that she did not intend to give her home to Meryl. Thus, the evidence presented an issue as to whether Meryl obtained the property for grossly inadequate consideration because of Mrs. Gelber's weakness of mind, as contended by the Executors, or whether Mrs. Gelber gifted the property to Meryl of her own free will, as claimed by Meryl.

We also conclude that the Executors presented sufficient evidence to prove that Meryl obtained the property under suspicious circumstances. Despite the careful and deliberate estate planning undertaken by Mrs. Gelber, which culminated in an estate plan that treated her children equally, Mrs. Gelber executed legal documents leaving her home and personal property solely to Meryl while she was confined in a hospital. In contrast to Mrs. Gelber's prior reliance on legal and financial advisors and involvement of all of her children, she executed documents that were inconsistent with her estate plan without the benefit of counsel or discussion with her other children. The arrangements for preparation and execution of the documents were made hastily and kept secret not only from three of Mrs. Gelber's children, but also from Meryl's husband.

29

According to the first attorney contacted by Philip and Meryl, the urgency of the matter caused him such apprehension that he declined the representation.[16]

We reject Meryl's argument that the Executors' own evidence rebutted any presumption of undue influence. Although Meryl contends that the Executors were bound by her testimony that Mrs. Gelber was alert during the execution of the documents and freely expressed her intention to give Meryl her home, the Executors were not bound by Meryl's testimony to the extent it was contradicted by the Executors' evidence. *See, e.g., Horne v. Milgrim*, 226 Va. 133, 139, 306 S.E.2d 893, 896 (1983) ("[A] plaintiff who calls the defendant as an adverse witness is not bound by so much of the defendant's testimony as is in conflict with the plaintiff's other evidence, but is bound only by testimony which is clear, reasonable, and uncontradicted."). Mrs. Gelber's own statements contradicted Meryl's testimony. According to the written declaration signed by Mrs. Gelber and her statements to other persons, she had no intention of relinquishing control over her property and believed that Meryl had taken advantage of her weakened mental and physical condition. Furthermore, in ruling on the motion to strike, the circuit court was

---

[16] As further support, the Executors rely on phone records admitted into evidence to prove that no phone call from Linda and Philip to Meryl occurred after Meryl called for the patient advocate and that the document signing could only have taken place in a 19-minute window between the time Meryl called for the patient advocate and Larry visited his mother. The Executors contend that Meryl fabricated the coincidental phone call from Linda and Philip to create telephonic witnesses to Mrs. Gelber's execution of the documents. On appeal, Meryl argues that the Executors misstate the time that phone calls on that date occurred because the records display the times in Coordinated Universal Time (UTC) and that the records do not prove who initiated the phone calls. To the extent the phone records created a conflict in the evidence on these points, this conflict was required to be resolved in favor of the Executors. Nevertheless, it is unnecessary for us to consider whether the phone records lend support to the existence of suspicious circumstance because we conclude the evidence established a prima facie case of suspicious circumstances without consideration of the phone records.

required to resolve these conflicting accounts in favor of the Executors. *See Austin*, 254 Va. at 138, 486 S.E.2d at 287.

ii.     Confidential Relationship

With regard to the existence of a confidential relationship, a presumption of undue influence may arise "[w]here one person stands in a relation of special confidence towards another, so as to acquire habitual influence over him." *Friendly Ice Cream Corp.*, 268 Va. at 32, 597 S.E.2d at 39 (quoting *Fishburne v. Ferguson*, 84 Va. 87, 112-13, 4 S.E. 575, 582 (1887)). "[E]quity considers the benefit to the person in the relation of special confidence presumptively invalid and, once that relationship and benefit is established, the burden of going forward with evidence that the transaction was fair rests on the proponent of the transaction." *Id.* A confidential relationship arises when it is clear that "the parties do not deal on equal terms, but, on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed." *Id*. at 34, 597 S.E.2d at 40 (quoting *Hancock v. Anderson*, 160 Va. 225, 240, 168 S.E. 458, 463 (1933)). In either case, "an unfair advantage is possible." *Id.* (quoting *Hancock*, 160 Va. at 240, 168 S.E. at 463).

A confidential relationship is "not confined to any specific association of the parties" but will arise when "a party is bound to act for the benefit of another, and can take no advantage to himself." *Id.* at 34, 597 S.E.2d at 39-40 (quoting *Hancock*, 160 Va. at 240, 168 S.E. at 463). As relevant here, we have held that a confidential relationship may exist between a parent and child when accompanied by a principal-agent relationship and between family members when one family member handles the finances of another. *Id.* A confidential relationship may also arise between co-owners of joint bank accounts, *Ayers*, 286 Va. at 228, 748 S.E.2d at 92; *Parfitt*, 277

31

Va. at 342, 672 S.E.2d at 830,[17] and when one party relies on the other party for assistance with daily needs and activities, *Ayers*, 286 Va. at 228-29, 748 S.E.2d at 93.

The evidence proved that Mrs. Gelber increasingly relied upon Meryl to take her to medical and other appointments, obtain groceries and clothing, and provide general care to Mrs. Gelber. Meryl was a joint owner of Mrs. Gelber's checking account,[18] reconciled the checkbook to the monthly bank statement, paid Mrs. Gelber's bills, and received monthly payments of $500 from the account, which was funded solely by Mrs. Gelber. Additionally, several witnesses testified about incidents showing that Meryl attempted to control access to Mrs. Gelber's medical information by other family members. Thus, the evidence supported the existence of a confidential relationship between Mrs. Gelber and Meryl based not only on the principal-agent relationship established by their joint ownership of the bank account funded by Mrs. Gelber and Meryl's assistance with Mrs. Gelber's finances, but also on Mrs. Gelber's dependency on Meryl for her transportation and daily needs particularly after she became too ill to care for herself.

---

[17] In *Parfitt*, we held that a confidential relationship existed, as a matter of law, between the decedent and her son *with respect to transactions involving a bank account* owned jointly by decedent and her son, to which the son had not contributed. *Parfitt*, 277 Va. at 340-42, 672 S.E.2d at 829-30. *See also Ayers*, 286 Va. at 228, 748 S.E.2d at 92 (holding that a confidential relationship existed, as a matter of law, between each of the co-owners and decedent *with respect to the jointly owned accounts*); Code § 6.2-619(A) (providing that "[p]arties to a joint account in a financial institution occupy the relation of principal and agent as to each other, with each standing as a principal in regard to his ownership interest in the joint account and as agent in regard to the ownership interest of the other party").

[18] Because the conveyances challenged by the Executors did not involve funds from Mrs. Gelber's bank account, the principle applied in *Parfitt* and *Ayers* – that a confidential relationship exists between co-owners of a joint bank account, as a matter of law, *as to transactions involving that account* – does not apply. However, Meryl's position as joint owner of Mrs. Gelber's bank account is a fact that bears on the determination of whether a confidential relationship existed between Mrs. Gelber and Meryl when the instruments were executed.

In sum, the evidence was sufficient to raise a presumption of undue influence. The Executors presented sufficient evidence from which a reasonable juror could conclude that due to Mrs. Gelber's great weakness of mind, Meryl obtained Mrs. Gelber's home and its contents for grossly inadequate consideration as well as under circumstances of suspicion (either of which raised a presumption of undue influence). The Executors also presented sufficient evidence from which a reasonable juror could conclude that a confidential relationship existed between Mrs. Gelber and Meryl (which also raised a presumption of undue influence). Therefore, the circuit court erred in granting Meryl's motion to strike this claim.

C. Promissory Fraud

The issue of whether the Executors introduced sufficient evidence to establish, as a matter of law, a prima facie case of fraud is also reviewed de novo. *See Parfitt*, 277 Va. at 339, 672 S.E.2d at 829. Viewing the evidence in the light most favorable to the Executors, *see Egan*, 290 Va. at 73, 772 S.E.2d at 772, we conclude that the Executors presented sufficient evidence to support a claim of promissory fraud against Meryl.

"Because fraud must involve a misrepresentation of a present or a pre-existing fact, fraud ordinarily cannot be predicated on unfulfilled promises or statements regarding future events." *SuperValu, Inc. v. Johnson*, 276 Va. 356, 367, 666 S.E.2d 335, 342 (2008). "Were the general rule otherwise, every breach of contract could be made the basis of an action in tort for fraud." *Lloyd v. Smith*, 150 Va. 132, 145, 142 S.E. 363, 365 (1928). "Nevertheless, if a defendant makes a promise that, when made, he has no intention of performing, that promise is considered a misrepresentation of present fact and may form the basis for a claim of actual fraud." *SuperValu, Inc.*, 276 Va. at 368, 666 S.E.2d at 342; *see also Colonial Ford Truck Sales, Inc. v. Schneider*, 228 Va. 671, 677, 325 S.E.2d 91, 94 (1985) ("[T]he promisor's intention – his state of mind – is

33

a matter of fact" and a misrepresentation about that intention "if made to induce the promisee to act to his detriment, is actionable as an actual fraud.").

"[A] false representation of a material fact, constituting an inducement to the contract, on which the purchaser had a right to rely, is always ground for rescission of the contract." *Abi-Najm v. Concord Condominium, LLC*, 280 Va. 350, 362, 699 S.E.2d 483, 489 (2010) (quoting *George Robberecht Seafood, Inc. v. Maitland Bros. Co.*, 220 Va. 109, 111-12, 255 S.E.2d 682, 683 (1979)). *See also Wilson v. Carpenter*, 91 Va. 183, 186-87, 21 S.E. 243, 244 (1895) ("No man is bound by a bargain into which he has been deceived by fraud or misrepresentation."); Kent Sinclair, Sinclair on Virginia Remedies, § 55-3[A], at 55-10-11(5th ed. 2016) ("Fraud or cognate forms of misrepresentation are long-recognized grounds for rescission in Virginia practice.").[19]

Fraud may be proved by direct or circumstantial evidence, but must be clearly and convincingly established.

> The charge of fraud is one easily made, and the burden of proving it rests on the party alleging its existence. It may be proved, not only by positive and direct evidence, but by showing facts and circumstances sufficient to support the conclusion of fraud. But however shown, the proof must be clear and convincing.

*Barbour v. Barbour*, 155 Va. 650, 653, 156 S.E. 365, 366 (1931) (quoting *Redwood v. Rogers*, 105 Va. 155, 158, 53 S.E. 6, 7 (1906)). *See also Fox Rest Assocs., L.P. v. Little*, 282 Va. 277, 284, 717 S.E.2d 126, 131 (2011) ("Fraud may be proved not only by direct evidence, but also by

---

[19] The Executors argue that to the extent the circuit court struck their fraud claim for lack of proof on damages, they were entitled to either rescind the property transfers or affirm the transfers and obtain damages upon establishing fraud. Although the Executors included a demand for damages in their complaint, they state on brief that "[t]he Executors in this case sought rescission of the Bill of Sale and Deed of Gift, as opposed to money damages."

34

circumstantial evidence."); *Sea-Land Service, Inc. v. O'Neal*, 224 Va. 343, 351, 297 S.E.2d 647, 651 (1982) (holding that "[t]he evidence in this case clearly, cogently, and convincingly supports" claim of fraud); *Masche v. Nichols*, 188 Va. 857, 864, 51 S.E.2d 144, 147 (1949) ("Fraud cannot be presumed but must be clearly established by either direct or circumstantial evidence."); Sinclair, *supra*, § 55-3[A], at 55-9 to 55-10 ("To warrant the remedy of a decree of rescission fraud must be plainly averred and clearly proven.").

First, the Executors presented sufficient evidence to prove that Meryl induced Mrs. Gelber to convey to Meryl her home and its contents by promising Mrs. Gelber that she would build an addition on her own home in which Mrs. Gelber could live. Mrs. Gelber signed a written declaration stating that she was "tricked by Meryl" into giving Meryl her home. According to Mrs. Gelber, Meryl told her she needed the home so she could sell it and use the money to fund the building of an addition. Consistent with Mrs. Gelber's written declaration, other witnesses testified that Mrs. Gelber told them that she and Meryl discussed a plan for Mrs. Gelber to live in an addition on Meryl's home.

Furthermore, the Executors presented sufficient evidence to prove that Meryl had no intention of building an addition for Mrs. Gelber when she made the promise to do so. Mrs. Gelber stated in her written declaration that Meryl led her to believe that she did not need any more treatment, but Mrs. Gelber now understood that her cancer was not in remission and that it would never be possible for her to move into Meryl's home. Additionally, Arnowitz confirmed that Mrs. Gelber misunderstood her prognosis and believed from Meryl that she would get better and return home or live in an addition on Meryl's property. Meryl denied that she ever discussed the idea of an addition with Mrs. Gelber, and it was clear from the time that Mrs. Gelber was hospitalized at St. Mary's that she would require full-time nursing care.

35

Accordingly, a reasonable juror could conclude from the evidence that Meryl told Mrs. Gelber she would build an addition on her home where Mrs. Gelber could live if Mrs. Gelber transferred her property to Meryl, and that Meryl made this promise with the then present intention not to perform it.[20] Because the Executors presented sufficient evidence to prove a prima facie case of promissory fraud, the circuit court erred in granting Meryl's motion to strike the Executors' evidence as to this claim.

D. Civil Conspiracy

The Executors contend that Meryl, Linda, and Philip worked together to unlawfully induce Mrs. Gelber into conveying her property to Meryl, and argue that they proved a civil conspiracy under "both the civil statute and at common law." Because the Executors did not establish damages, and a claim of civil conspiracy is not a proper vehicle under these facts to seek rescission, we conclude the circuit court did not err in granting Meryl's motion to strike the claims of civil conspiracy.

Code § 18.2-500(A) provides for recovery of "three-fold the damages" sustained by "[a]ny person who shall be injured in his reputation, trade, business or profession by reason of violation of § 18.2-499."[21] Code § 18.2-500(B) provides that the circuit court "shall have

---

[20] As discussed in Part V.B., *supra*, Meryl's argument that Mrs. Gelber lacked the capacity to be subjected to fraud presented an issue for resolution by the jury, as did Meryl's contention that the Executors' claim of fraud was inconsistent with Mrs. Gelber's statement that she had no recollection of signing the documents and did not intend to give her home to Meryl. It is the role of the jury, not the circuit court, to "judge the weight and credibility of the evidence." *Austin*, 254 Va. at 138, 486 S.E.2d at 287.

[21] Code § 18.2-499(A) states:

Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession

36

jurisdiction . . . to issue injunctions pendente lite and permanent injunctions" whenever a person files a civil action alleging violations of Code § 18.2-499 and prays that the defendant "be restrained and enjoined from continuing the acts complained of" in such action. Neither section provides for rescission of an instrument as an available remedy.

"A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by a criminal or unlawful means." *Commercial Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 249 Va. 39, 48, 453 S.E.2d 261, 267 (1995). "The foundation of a civil action of conspiracy is the damage caused by the acts committed in furtherance of the conspiracy." *Id.*; *see also Gallop v. Sharp*, 179 Va. 335, 338, 19 S.E.2d 84, 86 (1942) ("The gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means."). Therefore, "to sustain an action [for civil conspiracy] special damage must be proved." *Werth v. Fire Cos.' Adjustment Bureau, Inc.*, 160 Va. 845, 854, 171 S.E. 255, 258-59 (1933). "No cause of action exists without the resulting injury, and the damage produced must arise as the effective result of the conspiracy." *Gallop*, 179 Va. at 338, 19 S.E.2d at 86.

The object of a civil conspiracy claim is to spread liability to persons other than the primary tortfeasor. Consequently, "a common law claim of civil conspiracy generally requires proof that the underlying tort was committed." *Almy v. Grisham*, 273 Va. 68, 80, 639 S.E.2d 182, 188 (2007).

---

by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act, shall be jointly and severally guilty of a Class 1 misdemeanor. Such punishment shall be in addition to any civil relief recoverable under § 18.2-500.

> The function of a conspiracy claim differs in criminal and civil cases. In a criminal context, the purpose of conspiracy charges is to punish the act of agreement itself. *See* Wayne R. LaFave & Austin W. Scott, Jr., Criminal Law § 6.4(d) (2d. ed. 1986). Agreements to engage in criminal activity are considered dangerous to society in and of themselves, because of "the special danger incident to group activity." *Id.* at § 6.4(c). Thus, for a criminal conspiracy charge, there is no need to prove that the conspiracy led to an injury-causing criminal activity. In a civil context, however, the purpose of a conspiracy claim is to impute liability – to make X jointly liable with D for what D did to P. *See* W. Page Keeton et al., Prosser and Keeeton on the Law of Torts § 46 (5th ed. 1984). Thus, a civil conspiracy plaintiff must prove that someone in the conspiracy committed a tortious act that proximately caused his injury; the plaintiff can then hold other members of the conspiracy liable for that injury.

*Beck v. Prupis*, 162 F.3d 1090, 1099 n.18 (11th Cir. 1998), *aff'd*, 529 U.S. 494, 501-03 (2000). *See also Simpson v. Weeks*, 570 F.2d 240, 242-43 (8th Cir. 1978) ("The damage for which recovery may be had in a civil action is not the conspiracy itself but the injury to the plaintiff produced by specific overt acts. The charge of conspiracy in a civil action is merely the string whereby the plaintiff seeks to tie together those who, acting in concert, may be held responsible for any overt act or acts.") (citations omitted); *Boisjoly v. Morton Thiokol, Inc.*, 706 F. Supp. 795, 803 (D. Utah 1988) ("Civil conspiracy is essentially a tool allowing a plaintiff injured by the tort of one party to join and recover from a third party who conspired with the tortfeasor to bring about the tortious act."); *Adcock v. Brakegate, Ltd.*, 645 N.E.2d 888, 894 (Ill. 1994) ("The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's acts.").

Here, the Executors did not prove damages and seek only rescission of the deed of gift and bill of sale.[22] Although they have identified Linda and Philip as co-conspirators, they

---

[22] As we hold herein, the circuit court did not err in excluding the tax assessment records that the Executors sought to introduce into evidence to prove value of the home. The circuit court also sustained Meryl's objection to Larry's testimony regarding his own opinion on the

contend that it is Meryl who obtained the property through undue influence and fraud and have named her as the sole defendant from whom they seek relief. Under these facts, a claim for civil conspiracy against Meryl is not a proper mechanism by which the Executors can obtain rescission. *See Boisjoly*, 706 F. Supp. at 803-04 (noting that civil conspiracy "cannot be maintained in a suit involving a single defendant where the same underlying torts are also asserted by separate counts against the same defendant").

## VI. CONCLUSION

For the foregoing reasons, we hold that the circuit court did not err in denying the Executors' motion for partial summary judgment on the issue of title and possession of Mrs. Gelber's personal property, excluding from evidence the tax assessment records, and granting Meryl's motion to strike the Executors' evidence on their claims of civil conspiracy. However, we hold that the circuit court erred in excluding from evidence the declarations of Mrs. Gelber that were not contemporaneous with the execution of the documents and in granting Meryl's motion to strike the Executors' evidence as to their claims of undue influence and promissory fraud. Finally, because Meryl's entitlement to attorney's fees was based on the circuit court's ruling in her favor on her motion to strike, we vacate the award of attorney's fees.

Accordingly, we will affirm the judgment of the circuit court in part, reverse the judgment in part, and remand this case for a new trial consistent with this opinion.

*Affirmed in part,*
*reversed in part,*
*and remanded.*

---

value of Mrs. Gelber's home and the value of the home's contents. Although Larry testified that he ordered an inventory of the contents of the house when the property was transferred into trust, the circuit court sustained an objection to the introduction of the inventory. Additionally, the value of the contents as contained in the homeowners' policy was excluded. None of these other rulings are challenged on appeal. The Executors also do not challenge the circuit court's ruling that "damages were not proven."